Commonwealth *v.* Neff et al., Appellants.

Argued March 13, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*John Alan Conte*, with him *Paul E. Courtney, Blair F. Gunther*, and *Conte & Courtney*, for appellants.

*Richard P. Steward*, District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., June 15, 1961:

Samuel G. Neff, chairman of the Democratic Party of Beaver County, James S. Macry, secretary of the Democratic Party in Beaver County, Robert Yoho, assistant superintendent of the Pennsylvania Department of Highways, and Leon Kaleta, foreman of the Department of Highways in Beaver County, were convicted of (1) common law extortion and (2) conspiracy to extort money from contractors leasing equipment to the Department of Highways in Beaver County. The court below concluded that Neff and Macry were not public officers or quasi-public officers within the meaning of the common law relating to extortion and arrested judgment as to them on the extortion charge. After dismissing the motion in arrest of judgment as to Yoho and Kaleta on the extortion charge and as to all defendants on the conspiracy charge and after dismissing the motions for a new trial as to all defendants, the court below imposed sentence upon all four defendants. They have appealed.

From the evidence the jury could have found that Edward Nitsche, who was an employe of the highway department and who plead guilty and was the principal witness for the Commonwealth, was taken to Neff's home by Yoho sometime in the winter of 1955-56; that shortly after they arrived, Macry came in; that the discussion in Neff's home related to raising funds for Neff's campaign; that Nitsche was designated to secure money from contractors whose equipment was being used by the highway department; that Neff said

they ought to pay "at least five per cent"; that Neff said Nitsche knew the county better than anyone else and that he should go and contact the contractors; that in January 1956 Nitsche began collecting five per cent from contractors who rented the use of equipment to the highway department; that on one occasion a contractor named Rocco paid Nitsche $200.00; that he said to Nitsche, "You know you can be arrested for this."; that Nitsche reported to Neff what Rocco had said and Neff told Nitsche, "Well, don't ask him for anything more"; that Edward Biardo told Nitsche, "I will give $1000.00 toward the campaign if you get me a grader on for summer work"; that Nitsche informed Neff of the offer and Neff said, "Well, go ahead and see if you can get an agreement through for him"; that Yoho and Kaleta collected money from renters of equipment and they gave the money to Nitsche; that Nitsche delivered the money to Neff with a paper showing who had paid the money; that on two occasions Nitsche turned the money over to Macry pursuant to the understanding at the initial meeting; that subsequently Neff told Nitsche, "Turn the money over to me. I don't trust Macry"; that Neff instructed Nitsche not to cancel agreements but if contractors did not pay, not to let them work; that Nitsche secured from the payroll clerk a list of the amounts paid to contractors, thereby enabling him to compute the five per cent to be collected by him; that subsequently Nitsche secured the checks from the chief clerk and delivered them to the contractors from whom he collected; that Harry Harden arranged with Neff to put his equipment on highway work; that Yoho and Nitsche requested that Harden pay five per cent; that he refused to do this and his equipment was not used after the spring of 1957; that Nitsche told Leland Peters, who had equipment on highway work in May 1956, that he would have to kick back five per cent;

that Peters refused to do so and was replaced by a Democratic committeeman; that Clarence Corbin agreed with Nitsche to pay five per cent for the benefit of the party; that he paid money to Nitsche, Yoho and Kaleta; that Nitsche told Grayn Denny in January 1956 that there had been a meeting with Neff and Macry and they decided the contractors should pay five per cent for campaign funds; that Denny paid five or six hundred dollars; that Kaleta had told Denny to pay the money before Nitsche had approached him; that Denny paid on one occasion when Neff was present and Nitsche said to Neff, "I have yours"; that in January 1958 Denny picked up four five per cent checks from Carl Tragesser, Sr.; that previously Kaleta had said to him, "You can be replaced; you collect it or else"; that Edward Walton testified that Nitsche approached him relative to the five per cent payments and told him he would have to kick in or he wouldn't work; that John S. Brkich said Yoho told him he should inform Joseph Bogovich that it had been decided that Bogovich should give five per cent for a fund for campaign purposes; that Brkich collected and paid the money to Yoho; that Bogovich, on another occasion, paid money to Nitsche in the presence of Buttermore, the superintendent of the highway department; that Buttermore was present when Mrs. Corbin gave money to Nitsche; that in the latter part of 1956 Buttermore observed Nitsche, on two occasions, giving money to Neff; that Hasenkopf, a superintendent in the county, said he observed Nitsche giving money to Neff on one occasion; that the names of Harden, Corbin, Denny and Walton do not appear as contributors in any political campaign expense account filed in the Bureau of Elections of Beaver County for the primary or election of any pertinent year.

Counsel for the appellants first argued that the court erred in ruling that the six-year statute of limitations was applicable to the crime of extortion by a public officer or employe and to the crime of conspiracy to extort. The Act of April 6, 1939, P. L. 17, §1, 19 PS §211, amended the Act of 1860 as follows: ". . . And provided also, That indictments for malfeasance, misfeasance, or nonfeasance in office, or for *extortion* or blackmail by color of office, or for embezzlement of public moneys or property or fraudulent conversion of public moneys or property, or for any misdemeanor in office, or for any *conspiracy to commit any of said offenses* heretofore or hereafter committed by any *officer or employe of this Commonwealth* or of any agency thereof, or of any city, county, borough, township, or school district or of any agency thereof, and their *accomplices* and *confederates,* may be brought or exhibited at any time within two years from the time when said public officer or said employe shall have ceased to occupy such office or such employment, but in no event more than six years from the commission of the offense." (Emphasis supplied) It is argued that "The provision of two years from the leaving of office or employment and its alternative of in no event more than six years from the date of the offense cannot stand alone. Its construction requires the addition of these words—'whichever is shorter.' ' The only defendant in the extortion charge to which this argument applies is Robert Yoho. He left office on March 29, 1957 and was not indicted until September 18, 1959. It is argued that since more than two years intervened after he left office that the 1939 amendment does not apply and that the statute of limitations is two years in his case. We do not agree with this argument. The indictment was presented or found within six years from the com-

mission of the offense and the amendment of 1939 is applicable to his case.

Counsel have not furnished the court with any appellate court decisions interpreting the 1939 amendment as applied to the facts of this case. Our independent research has revealed no appellate court decision on this point. It is our opinion that the legislature never intended an interpretation such as is now presented by counsel for the appellants. We believe that it was the intention of the legislature to fix a six-year period of limitation from the commission of the offense, notwithstanding the fact that the indictment may have been presented or found more than two years after the officer or employe left his employment. If we were to adopt the reasoning suggested by the appellants, we would be obliged to rule as follows:

| Offense | Left Employment | Indictment Found |
|---------|-----------------|------------------|
| A Jan. 1, 1956 | Jan. 1, 1957 | Jan. 1, 1960 |
| B Jan. 1, 1952 | Jan. 1, 1957 | Jan. 1, 1958 |

A could not be indicted because he left his employment more than two years before the indictment was found. In A's case the indictment was found within four years of the offense. B could be indicted because he left his employment one year before the indictment and the indictment was within six years of the commission of the offense. A, who was indicted four years from the offense, would go free and B, who was indicted six years from the offense, would have to stand trial. Certainly the legislature never intended such an absurd result. See Act of May 28, 1937, P. L. 1019, art. IV, §52, 46 PS §552(1).

It is also argued that the general two-year statute of limitations (two years from the last concerted ac-

tion) is applicable to the charge of conspiracy to extort and not the six years from the date of the offense. *Com. v. Parish,* 176 Pa. Superior Ct. 267, 107 A. 2d 203, and *Com. v. Kauffman,* 190 Pa. Superior Ct. 444, 154 A. 2d 269, are cited in support of this position. Neither of these cases interpreted the 1939 amendment with which we are here concerned. These cases involved the amendatory Act of May 16, 1945, P. L. 582, No. 238, §1, 19 PS §213, which contained the express provision that "The provisions of this section shall not be construed so as to apply to indictments for any felony or misdemeanor other than those as to which any of the foregoing relationships to a bank, body corporate or public company, . . . is an essential element of the crime." The Court in those cases correctly ruled that the six-year limitation provided by the Act of 1945 is applicable only when the named relationship to a body corporate or a public company is an essential element of the crime. No such express provision is contained in the 1939 amendment here under consideration. The 1939 amendment is made expressly applicable to officers or employes of the Commonwealth and their *accomplices and confederates.* If some of the defendants were officers or employes, the 1939 amendment would be applicable to their accomplices and confederates on a charge of conspiracy to extort.

It is also argued that the court below erred in ruling that Leon Kaleta was a quasi-public officer. Kaleta was foreman of the Pennsylvania Department of Highways in Beaver County. His position cloaked him with authority to use certain contractors' equipment or not to use it. Common law extortion can be committed by a quasi-public officer: 35 C.J.S., Extortion, §9; 22 Am. Jur., Extortion and Blackmail, §8. See also *Com. v. Saulsbury,* 152 Pa. 554, 25 A. 610; *Com. v. Miller,* 94 Pa. Superior Ct. 499; *Com. v. Get-*

*tis,* 166 Pa. Superior Ct. 515, 72 A. 2d 619. If Kaleta was less than a public officer, he was nevertheless more than a mere employe. He was a quasi-public officer and as such could be guilty of common law extortion.

Action under color of office is referred to in *Com. v. Channing,* 55 Pa. Superior Ct. 510, 516, as follows: "Amongst the judicially recognized definitions of color of office, applying to the differing states of facts that may arise, are: a pretense of official right to do an act, made by one who has no such right; the use of official authority as a pretext or cover for the commission of some corrupt or vicious act; an act wrongfully done by an officer under the pretended authority of his office: 7 Cyc. of Law & Pro., 401; Com. v. Wilson, 30 Pa. Superior Ct. 26. The last definition furnishes the test to be applied here."

Kaleta, in our opinion, was a quasi-public officer. He acted as if he were a public officer. He and his confederates exercised the power to determine who did receive contracts with the State Highway Department and who did not, and who worked and who did not. In a practical sense he and his confederates possessed and exercised the basic and fundamental power in that regard.

Other examples of persons whose position of authority was sufficient to render them liable to prosecution for the offense of extortion at common law are *Com. v. Bernstine,* 308 Pa. 394, 162 A. 297, attorney-at-law; *Com. v. Wilson (No. 1),* 30 Pa. Superior Ct. 26, captain of police in the City of Allegheny; *Com. v. Channing,* supra, coal and iron policeman paid by private coal company; *Com. v. Norris,* 87 Pa. Superior Ct. 61, chief of the police of the Borough of Emporium; *Com. v. Ruff,* 92 Pa. Superior Ct. 530, chief of police and attorney-at-law; *Com. v. Fickes,* 105 Pa. Superior Ct. 199, 160 A. 142, constable of the City of York.

The Penal Code of June 24, 1939, P. L. 872, §1101, 18 PS §5101, provides: "Every offense now punishable either by the statute or common law of this Commonwealth and not specifically provided for by this act, shall continue to be an offense punishable as heretofore."

Although extortion as it is defined at common law was not specifically provided for in The Penal Code, it is a part of the common law of this Commonwealth and thus continues to be an offense punishable as heretofore. See *Com. v. Wilson (No. 1)*, supra. In *Com. v. Bausewine*, 354 Pa. 35, 46 A. 2d 491, it was held that the chief of police of the Borough of Norristown, while not an officer of the Commonwealth within the meaning of §303 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4303, relating to bribery, did occupy such a position as to be subject to indictment, trial and conviction for bribery at common law.

In *Com. v. Benedict et al.*, 114 Pa. Superior Ct. 183, 173 A. 850, defendant was charged with bribery for having paid money to an inspector for the Pennsylvania Alcohol Permit Board in an indictment containing the phrase "contrary to the Act of Assembly" and his demurrer to the indictment, on the ground that the inspector was not an "officer of the Commonwealth" or a "public officer" within the meaning of the statutes, was overruled by the trial court. We affirmed the ruling that the defendant could be proceeded against at common law and that the indictment was good as drawn.

While defendants were tried on the theory of quasi-public officers, the verdicts can be sustained by viewing the designation of their offices as surplusage. It is a well established rule of criminal pleading that all unnecessary words may be rejected as surplusage if the indictment would be good after they were stricken out: *Com. v. Bristow*, 185 Pa. Superior Ct. 448, 459,

138 A. 2d 156. We therefore agree with the conclusion of the court below that the defendants, except Neff and Macry, did commit the common law offense of extortion.

Counsel for appellants also argue that the court below erred in ruling that there was sufficient evidence to establish the crime of conspiracy to extort. A mere recitation of the facts as they could be found by the jury is sufficient to refute this argument.

Counsel for appellants also complain of 13 trial errors which they contend make necessary a new trial. We do not intend to specifically refer to these. We have carefully reviewed the entire record and are convinced that there is no justification for any of these 13 charges. This case was tried very ably by Judge MORGAN H. SOHN. He was at all times impartial and more than fair to the defendants. In his charge, comprising approximately 50 typewritten pages, he not only clearly covered the law as applied to common law extortion and conspiracy to extort but he thoroughly covered the law on such subjects as the burden of proof, reasonable doubt, the testimony of an accomplice, alibi testimony, testimony of good reputation, etc. He also gave a very complete recitation of the testimony of the witnesses of the Commonwealth as well as the defendants. We are convinced that the defendants received a fair trial and were justly convicted.

Judgments of sentence are affirmed and it is ordered that appellants appear in the court below at such time as they may there be called and that they be by that court committed until they have complied with their sentences or any part thereof which had not been performed at the time the order of supersedeas was entered.

Concurring and Dissenting Opinion by Montgomery, J.:

Although I agree with the results attained by the majority in these appeals, I respectfully disagree with some of its reasoning. Particularly, I do not agree that a general six-year status of limitations is applicable.

The Act of 1939, April 6, P. L. 17, §1, 19 P.S. §211, is the applicable statute.[1] It provides generally for a two-year limitation on the time for bringing prosecutions in such cases as we are considering (extortion and conspiracy to extort). However, it does contain certain provisions relating to (a) absentees, (b) officers of banks and other corporations, and (c) public officers, employes and their accomplices and confederates, in which cases the running of the general provisions of the statute is postponed or the time of the limitation period is extended. In the case of absentees, its running is postponed until the offenders return; in the case of bank and corporation officers, it is extended to six years; but in the case of public officers and employes, it is postponed with a limitation on the period of postponement. The majority in its opinion ignores the postponement provision because it believes that its application creates an absurd situation in the light of the limitation and considers this provision as a general extension as in the second provision. I find no absurdity in the application of both provisions but, on the contrary, see a reasonable result. The obvious intention of the legislature was to deny to offenders in government service the benefits of the statute until they had been out of service two years, during which period their affairs while in office could more readily

---

[1] The Act of 1945, May 16, P. L. 582, No. 238, §1, 19 P.S. §213, applies to various corporate bodies and not to the Commonwealth or its subdivision as in this case.

be explored than when they were still present in office. However, the legislature apparently did not wish to extend this privilege to enforcement agencies beyond the six years provided as the period of limitation for bank and other corporate officers (as extended by proviso (b)). Under the Statutory Construction Act of 1937, May 28, P. L. 1019, article IV, §52, 46 P.S. §552, we are obligated to give meaning, if possible, to all parts of legislative enactments, and I think both provisions should be applied in this case.

The application of both provisions may, of course, give some offenders an advantage over others, and it will make it possible for an unfaithful governmental officer or employe to conceal his crime and secure the benefit of the statute of limitations by preserving his status as an officer or employe beyond the six-year period. However, this is no different from the situation with reference to a bank or corporate officer. The legislature distinguished them in this fashion and it is not for this Court to remove that distinction.

My views as to which period governs, however, do not help the appellants. Although this conspiracy was formed in the winter of 1955-1956, when Neff, Nitsche, Yoho, and Macry met at the home of Neff, and was later extended to include Kaleta, who shortly thereafter joined it and began making collections from contractors, the date a conspiracy is conceived does not determine the time from which the statute of limitations begins to run. In conspiracy cases, the statute begins to run from the termination of the unlawful conduct, and not from its inception. *Commonwealth v. Kirk*, 340 Pa. 346, 17 A. 2d 195. There is evidence in this case that the illegal operations contemplated by the conspirators continued until 1958. Since the true bills were returned by the Grand Jury in the fall of 1959, they were within the two-year statutory period. Although Yoho left his position in 1957, this did

not divorce him from the conspiracy; he would be held criminally responsible for acts occurring thereafter even though committed by an associate or confederate. The act of one conspirator is the act of all. *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Hall*, 173 Pa. Superior Ct. 285, 98 A. 2d 386.

The last act of extortion evidenced by the record was in 1958, when Grayn Denny (not a conspirator, but identified as a victim) picked up four five per cent checks from Carl V. Tragesser, Sr., under compulsion by Kaleta. Previously Kaleta had said to him, "You can be replaced; you collect it or else." On the theory that all conspirators are criminally responsible for the acts of each other performed pursuant to the conspiracy, this would constitute an act of extortion by each, Neff, Kaleta, Yoho, Nitsche, and Macry. The fact that Denny was used as an agent to make the collection from Tragesser would be of no consequence; he acted under threat of Kaleta. In *Commonwealth v. Wilson*, 30 Pa. Superior Ct. 26, the extortion money was collected by a third party and not by the defendant.

Appellants argue that no overt acts were committed by Neff, Macry, or Yoho within the prescribed statutory period. This would be immaterial if any one of the conspirators committed an act in furtherance of the conspiracy during the period because each is equally involved in the acts of the others.[2]

Nitsche's withdrawal would not affect the relationship existing between the other conspirators. The withdrawal of a conspirator after the formation of the conspiracy neither creates a new conspiracy nor changes the status of the remaining members. 15 C.J.S. Conspiracy §78, p. 1110.

---

[2] 11 Am. Jur. Conspiracy, section 8, page 548; *Com. v. Rhey*, 140 Pa. Superior Ct. 340, 350, 14 A. 2d 192; *Com. v. Antico*, 146 Pa. Superior Ct. 293, 22 A. 2d 204; *Com. v. Hall*, 173 Pa. Superior Ct. 285, 98 A. 2d 386.

Appellants argue further that the payments made in 1958 were voluntary and not extorted. Regardless, even though those acts committed in 1958 were not acts of extortion, the indictments were returned as true bills well within the six-year period from the commission of the earliest act and within two years from the date that Kaleta left office (January, 1959), which would be the determinative date as to him as well as to all of his co-conspirators.

I fail to see why the lower court granted the motion in arrest of the judgments against Neff and Macry on the extortion charge. Although they were not governmental officers or employes, they were, nevertheless, part of the conspiracy that planned the acts of extortion; and as I have already said, they were equally responsible for these acts, although they were committed by the governmental persons. The fact that the threats were based on the power of the offices held by Yoho, Kaleta, and Nitsche and not on their own would be immaterial. They are in no different position from the person who conspires with another to commit a murder. Each is equally guilty regardless of who commits the actual murder.[3]

At common law extortion was the crime of extorting money illegally by color of the extortioner's own office. However, convictions for extortion have been sustained on threats based on powers not actually held but merely assumed "or pretended to be possessed." *Commonwealth v. Wilson,* supra, at page 30. Further, as stated by this Court in *Commonwealth v. Hansell,* 185 Pa. Superior Ct. 443, 446, 137 A. 2d 816, 181, "A person who commits an unlawful act is not relieved from the penalty because he was employed by another to do so or because he acted as his agent. Com. v. Kolb, 13 Pa. Superior Ct. 347, 354." There may be joint re-

---

[3] *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313.

sponsibilities for common law extortions and it may be committed without the presence of the extortioner. 35 C.J.S. Extortion §9, p. 362.

The evidence is clear in this case that, in directing the operations of the scheme, Neff and Macry, who held the political power in Beaver County with control over employes who held governmental power, assumed the governmental powers directly, or acted as agents for those holding it. Whether on the theory of co-conspirators, agency, or assumption of power, their convictions of extortion, as well as conspiracy, should have been sustained.

The decision in this case depends largely upon the status of Kaleta. I subscribe to the view of the lower court and of the majority of this Court that Kaleta was within the category of a quasi-public officer. I agree also that the evidence is sufficient to establish the fact that he was part of the conspiracy and committed overt acts as late as 1958 in furtherance of its purpose. I agree also with the fact that Denney was a victim and not an accomplice or co-conspirator.

This Court has said many times that conspiracies may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators, *Commonwealth v. Albert*, 151 Pa. Superior Ct. 184, 30 A. 2d 184; but in this case there is direct evidence in addition to the inferences that can be drawn.

I join in the results.

Flood, J., concurs in this concurring and dissenting opinion.

―――

Dissenting Opinion by Watkins, J.:

I would arrest judgment and discharge the defendants. If the solicitations for funds for campaign purposes by political committees from contractors engaged

in state work or seeking state work, in itself, is illegal then the jails of this Commonwealth are due for a large increase in population.

The line between what is a voluntary contribution for political purposes and what is a compulsory contribution for political purposes based on threat or promise, amounting to extortion, is so extremely thin that I do not believe the evidence in this case was sufficient, either qualitatively or quantitatively to convict these defendants beyond a reasonable doubt and so support the convictions.

The jury could only come to its conclusion that the payments in fact were the result of extortion by conjecture and regardless of how ably and fairly this case was tried by the court below, the jury could not help but be influenced by the atmosphere of the trial, affected as it was by the glare of publicity occasioned by the political overtones involved in the case and the local and state prominence of the defendants.

WOODSIDE, J., joins in this dissenting opinion.