**UNITED STATES of America**
v.
**Frank MAZZEI.**
**Crim. No. 74–319.**

United States District Court,
W. D. Pennsylvania.
March 17, 1975.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

H. David Rothman, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, Chief Judge.

After conviction by a jury the defendant, Frank Mazzei, filed a "Motion for Judgment of Acquittal or in the Alternative for a New Trial." In our opinion the motion and the alternative motion should be denied.[1]

---

1. The defendant filed a "Motion to Allow the Filing of Additional Reasons After a Review of the Transcript." The motion was granted. The transcript was filed January 23, 1975. The defendant did not file any formal additional reasons, but submitted his brief on February 10, 1975 and the government submitted its brief on February 19, 1975. Oral argument was held on February 28, 1975.

The motion sets forth the following reasons in support thereof:

2. The court erred in denying the motion for judgment of acquittal.

3. The verdict was contrary to law and against the weight of the evidence.

4. Error in refusing to declare a mistrial on the prosecutor's examination of Mr. Kelly wherein he interjected the notion that defendant might be pocketing the money received.

5. Error in allowing the witness Williams to testify to the witness Kelly's state of mind.

6. Error in ruling relative to the scope of the cross-examination of defendant in the event he testified on his own behalf which deprived defendant of the opportunity to testify in his own behalf and violated his privilege against self-incrimination.

7. Error in failing to declare a mistrial when the United States Attorney argued in his closing speech that the taxpayers of Pennsylvania could have received these leases for $20,000 less.

8. Error in refusing to charge as requested and in failing to correct its charge as requested in the particulars which appear of record.

9. Error in declining counsel's request for an individual voir dire of the prospective jurors.

10. Error in denying defense counsel's request to close last or, in the alternative, to make a brief argument in rebuttal.

11. Error in denying the motion to dismiss the indictment with prejudice made before the selection of the jury in view of the pretrial publicity which appeared on the eve of trial.

■ We summarize the facts in the light most favorable to the verdict winner. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Dukow, 465 F.2d 688 (3rd Cir. 1972).

The defendant is an elected senator for the Commonwealth of Pennsylvania having been elected in the Forty-Third Senatorial District which includes the area known as the South Side, Pittsburgh, Pennsylvania. He was first elected in a special election for a one-year term to begin in January, 1968, and was subsequently re-elected for four-year terms commencing in January, 1969, and January, 1973.

BMI, Inc. (BMI) is the parent corporation and holding company of 15 or 16 subsidiaries, most of which are engaged in interstate commerce. BMI and its subsidiaries were served by the same Board of Directors. Through a subsidiary, BMI purchased a three-story building at 700 Bingham Street in the South Side on March 1, 1967. BMI occupied only one-half of the second floor, or only about 4,000 square feet of the total 60,000 square feet contained in the building. The remainder of the building was vacant and, without tenants, there were no rentals to increase the profits of the corporation or to defray the expense of the building. Attempts by BMI to rent or sell the building had been unsuccessful.

BMI was the nerve center of the accounting end of the business of all the subsidiary corporations. Practically all of the financial matters of BMI and its subsidiaries, including interstate financing transactions, were handled from the South Side location by means of interstate telephone facilities and by use of the mails. The payroll for BMI and the subsidiaries was handled through a single payroll account maintained in the Iron and Glass Bank located in the South Side not far from the BMI building.

Occupants of the BMI quarters in the South Side were: Leo B. Kelly, Vice President and Secretary/Treasurer of BMI and its subsidiaries, and a certified public accountant; Willard Bellows, the Controller; and Joseph Logan, Assistant

Treasurer. Lawrence Williams, the President of BMI, had his office at another location in the Pittsburgh area. At times, the Board of Directors of BMI and its subsidiaries held meetings in the BMI building.

Mr. Kelly was also a director of the Iron and Glass Bank. Gerald R. Creehan was Vice President and Cashier of the bank. BMI was one of the bank's largest customers and Mr. Kelly had told Mr. Creehan of his desire to obtain tenants for the BMI building. According to Mr. Kelly's testimony, sometime prior to November 4, 1971, Mr. Creehan had heard that the defendant, Senator Mazzei, who had sponsored the State Lottery Bill, was looking for space in the South Side for the Pennsylvania Lottery Commission. When Mr. Creehan mentioned this, Mr. Kelly asked him to set up a meeting with the Senator. A luncheon meeting was arranged in late November, 1971, at which time Mr. Kelly entertained the Senator and Mr. Creehan, and told Senator Mazzei that BMI desired to lease space in its building.

A short time later the Senator visited the BMI building with a Samuel Myers and informed Mr. Kelly that the State would lease the first floor at the rate of $4.25 per square foot. Mr. Kelly did not negotiate the lease or price with anyone connected with any executive department of the State Government, although there were inspections made by employees of executive agencies. On January 8, 1972, Mr. Kelly again entertained the Senator and Mr. Creehan, this time at a dinner attended by the men's wives. In his testimony Kelly characterized the dinner as primarily a business meeting.

The defendant made it clear to Mr. Kelly that he expected a kickback. Mr. Kelly testified that the Senator told him at a January 11, 1972 meeting in Mr. Kelly's office that:

"it was the practice on all state leases that a ten per cent of the gross amount of the rentals would be paid to a senate finance re-election committee and that these funds were used for the incumbents or the senators of both parties, and that that would have to come out of the four and a quarter." (Tr. p. 207).

Penciled calculations (GX 7) made by the Senator indicated that the net amount of the rental for five years would be ten percent less than the gross. The Senator asked Mr. Kelly if that was satisfactory and Mr. Kelly replied in the affirmative. The Senator stated that ten percent should be paid in cash at the beginning of the lease term and inquired of Mr. Kelly if that created any problem. Mr. Kelly replied in the negative. Following the meeting, Mr. Kelly informed Mr. Bellows and Mr. Logan of the terms of the arrangement and showed them the paper on which the Senator made his calculations. Mr. Kelly also informed Mr. Williams and other stockholders about the arrangement.

A lease proposal form was mailed to the State by BMI on January 13, 1972. An unexecuted lease arrived from Harrisburg about February 23rd. The lease was executed by BMI officers and returned to Harrisburg. BMI received the final lease executed by the Commonwealth about March 23, 1972. On March 24, 1972, the Senator called at the Iron and Glass Bank for the money. At the direction of Mr. Kelly, Mr. Creehan and another bank employee delivered $8,755.00 in cash to the defendant at his office which was almost across the street from the bank. There was no evidence that this kickback was ever paid to a senate re-election committee as the Senator had represented.

In November or December, 1972, Senator Mazzei inquired of Kelly about leasing space to the Department of Labor and Industry. An employee of the Department visited the premises on December 27, 1972. Subsequently, the defendant advised Mr. Kelly that a rate of $4.90 per square foot would be paid by the State and also advised that the same arrangement would be in effect whereby ten percent would be paid to the re-election committee. At a July 18, 1973 meeting in Kelly's office the Senator began calculations on a BMI note pad to

determine the total rental for the five-year term of the second lease. Mr. Kelly completed these calculations and determined that the kickback would be about $11,300.00 (GX 12).

When BMI submitted this lease proposal, however, it requested a rental rate of $4.35 per square foot because it did not wish to provide janitorial service or trash removal. Mr. Kelly testified that Senator Mazzei later called him to say that "the Commonwealth or the Department, whoever takes care of leasing" (Tr. p. 262) would not accept the premises without these services and that the rate should be $4.90 and the proposal should include janitorial and trash removal services. During the telephone conversation with the Senator, Mr. Kelly agreed to these changes. No amended proposal form was ever submitted by BMI, but when the lease was received from the State it provided for a rate of $4.90 per square foot.

On Friday, July 20, 1973, Mr. Kelly was told by Senator Mazzei that the second lease had been executed by the State and that the Senator needed the money to take with him to Harrisburg on Monday. Mr. Kelly, accompanied by Mr. Williams, President of BMI, obtained $11,299.56 in cash from the bank and walked to the defendant's office where Mr. Kelly personally handed the money to the defendant's secretary. Later that same day, in a telephone conversation with Mr. Kelly, the Senator acknowledged receipt of the money. There was no evidence that this kickback was paid to a senate re-election committee. Defendant and his wife were entertained in Florida in early 1974 by an employee of BMI because a third lease with the State was pending.

The defendant indicated a consciousness of wrongdoing when he subsequently, according to Mr. Kelly's testimony, told Mr. Kelly not to reveal the payments to anyone. Later when the Senator visited Mr. Kelly's office and learned that Mr. Kelly had told his attorney everything about the leases and the payments, the Senator told Mr. Kelly that the FBI would wonder why he was in Kelly's office and asked Mr. Kelly to buy a ticket for a dinner for another senator. On cross-examination, Mr. Kelly stated that he felt the defendant, being an elected official, could handle the leases and obtain them for BMI.

Cash given to the defendant in the total sum of $20,054.56 was withdrawn on the payroll accounts of BMI and certain of its subsidiaries. There was no evidence that either BMI or the defendant treated the payments as real estate commissions. The kickbacks were not deducted as expenses in the corporate tax returns of BMI.

The prosecution contended that the ten percent rental payments were extorted from BMI by the defendant "under color of official right." The defendant contended the payments were political contributions, albeit illegal contributions from a corporation, obtained by the Senator in his unofficial role as a politician and not in his official capacity as a state senator. There was no evidence showing what the defendant did with the money after he received it. The actual existence of a bi-partisan senate committee for re-election of incumbent senators was not established in the evidence. No member of such a committee was called to prove its existence or the receipt of any part of the $20,054.56. The jury rejected the defendant's contentions that these payments were political contributions and found that this money was extorted by the defendant "under color of official right."

The defendant's 10 reasons in support of his motion for new trial, previously listed above, will now be dealt with in order.

## REASONS 2–3

█ In our opinion the verdict of guilty was in accord with the weight of the evidence, was not contrary to law, and the motions for judgment of acquittal were properly denied.

Arguing in support of his motion for judgment of acquittal, defendant appar-

ently contends that to pass constitutional muster the Hobbs Act, 18 U.S.C. § 1951, must require notice that extortionate conduct will interfere with interstate commerce, and that, absent such notice, the statutory definition of extortion is constitutionally vague. We do not agree.

■■ The purpose of the Hobbs Act is to free interstate commerce from the destructive burdens of extortion. Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); United States v. Green, 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956). The Act expressly proscribes extortion which affects commerce "in any way or degree" and clearly represents an attempt by Congress to exercise its full power under the commerce clause to reach extortionate conduct. Assuredly, the Act requires proof of an effect on commerce as a substantive element of any violation, but this is merely a jurisdictional element underlying the power of Congress to reach the conduct. An essential part of a Hobbs Act violation is extortion, and the fact that interstate commerce is interfered with is merely the basis for federal jurisdiction. It is wholly irrelevant to the protection of commerce that the perpetrator of an extortionate scheme *know* that interstate commerce is involved, and such a requirement would defeat the Congressional purpose of freeing commerce from all extortion. Contrary to defendant's contention throughout his brief, the jury did not have to find that he could reasonably foresee or anticipate an interference with commerce before he could be convicted of violating the Hobbs Act. See United States v. Iannelli, 477 F.2d 999, 1002 (3rd Cir. 1973), cert. granted,

417 U.S. 907, 94 S.Ct. 2602, 41 L.Ed.2d 211 (1974); United States v. Roselli, 432 F.2d 879, 891 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L. Ed.2d 828 (1971) and United States v. Blassingame, 427 F.2d 329 (2nd Cir. 1970), cert. denied, 402 U.S. 945, 91 S. Ct. 1629, 29 L.Ed.2d 114 (1971). *Cf.* United States v. Bolin, 423 F.2d 834, 836–837 (9th Cir.), cert. denied, 398 U.S. 954, 90 S.Ct. 1882, 26 L.Ed.2d 297 (1970).

■ Likewise, defendant's argument that *knowledge* of interference with commerce is in some manner a constitutional predicate to criminal responsibility has no basis in law. The scope of congressional police power under the commerce clause was considered by the Supreme Court in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), and it is clear that the power to protect interstate commerce is not premised on, or limited by, a requirement of specific intent to interfere with commerce.[2] The decisions under the Hobbs Act clearly reflect this. United States v. Addonizio, 451 F.2d 49, 76–77 (3rd Cir. 1972); United States v. Pranno, 385 F.2d 387, 389–390 (7th Cir. 1967).[3]

■■ The requisite impact on commerce can be *de minimus*, United States v. DeMet, 486 F.2d 816, 822 (7th Cir. 1973). The jury was justified in finding interference with commerce based upon depletion of BMI's cash assets in an amount in excess of $20,000. United States v. Addonizio, *supra*, 451 F.2d at 77; United States v. Provenzano, 334 F.2d 678, 692–693 (3rd Cir. 1964).

■ Insofar as the defendant contends that the phrase "under color of of-

2. In *Perez, supra,* the court held that Congress could regulate purely intrastate extortionate credit transactions if it found that, considered as a class, such activities had an ultimate effect on commerce.

3. In response to a similar contention the court in *Pranno, supra,* 385 F.2d at 389–390, stated:

"Defendants seem to contend that it must be proved that defendants contemplated and intended that interstate commerce would be affected.

All that must be proved, however, is that defendants conspired to commit extortion, and that the natural effect of carrying out their threat, whether they were conscious of it or not, would affect commerce." (Footnote omitted).

ficial right" as used in § 1951(b)(2) is void for vagueness, it is our opinion that this language is all that is constitutionally required in that it would give a person of ordinary intelligence fair notice of what is proscribed by the statute. Grayned v. City of Rockford, 408 U.S. 104, 108–114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The defendant's argument that the case should not have been submitted to the jury because the defendant did not have "official capacity" to channel the leases to BMI cannot be sustained. The evidence was overwhelming that the defendant senator represented to Mr. Kelly that he had "de facto" power to procure state leases. Mr. Kelly believed this and, without negotiating with any other person, paid $20,054.56 to the Senator for procuring those leases for BMI. The Senator's representations and actions caused Kelly to reasonably believe that the defendant, as a state senator, had the capacity and the power to procure the leases; the evidence strongly indicates he did have the power, within rate limitations, to procure leases for BMI because of his official position. He did not ask for a real estate commission; he did not ask for a political contribution. He wrongfully represented that it was the practice that state lessors should pay him, a state senator, ten percent of the gross rental for a senate re-election committee, although there was no independent proof of the existence of such a committee. As in United States v. Price, 507 F.2d 1349, 1350 (4th Cir.

1974), we reject the defendant's contention "that guilt may be predicated only upon a further finding that he perverted the *legal* or *statutory* power (*de jure*) of his public office. It is enough that he appeared to act under . . . 'color of official right.'" See also: United States v. Braasch, 505 F.2d 139, 151 (7th Cir. 1974); United States v. Staszcuk, 502 F.2d 875, 878 (7th Cir. 1974). Senator Mazzei, a public official, wrongfully took money not due him or his office.

Even under the common law definition of extortion, it was not necessary to show that the public officer received the extorted money for the performance or non-performance of an act specifically within the scope of his official duties. See: Commonwealth v. Wilson, 30 Pa. Super. 26 (1906).[4] See also: Commonwealth v. Neff, 195 Pa.Super. 420, 428, 171 A.2d 561, 565 (1961).

▇▇▇▇ Defendant argues that the government did not prove that the defendant took the oath of office and, therefore, did not prove he was in fact a senator. On the contrary, we find that the weight of the evidence introduced by the government clearly establishes that the defendant Mazzei was a state senator. Official election returns introduced into evidence show that Mazzei was first elected in a special election held in November, 1967 and that he was subsequently re-elected to full four-year terms in November, 1968 and November, 1972. In fact, in the 1972 election Mazzei was the candidate for both parties receiving

4. In *Wilson, supra* at 30, Judge Rice explained common law extortion as follows:

"The form of extortion most commonly dealt with in the decisions is the corrupt taking by a person in office of a fee for services which should be rendered gratuitously; . . . but this is not a complete definition of the offense, by which I mean that it does not include every form of common-law extortion. . . . Blackstone defines it to be 'An abuse of public justice which consists in an officer's unlawfully taking, by color of his office, from any man, any money or thing of value that is not due to him, or more than is due, or before it is due:' 4 Bl.Com. 141.

This definition without substantial change of phraseology has been adopted in the Pennsylvania decisions. An essential element of the offense is that the fee or reward must be taken by the officer by color of his office, *but this does not necessarily imply that it must be taken for an act or service which it is his duty, or he has discretionary power, to perform.* It does imply, however, an exercise of official power possessed, *or pretended to be possessed,* by the officer, as distinguished from an act which could have been performed by any other person." (Emphasis supplied)

56,685 votes as a Democrat and 29,264 write-in votes as a Republican.[5]

For the foregoing reasons we think it would be error to grant the defendant's motion for judgment of acquittal.

### REASON 4

It is our opinion that a mistrial was not warranted when the prosecutor interjected the notion that Senator Mazzei might have pocketed the money.

■ What the defendant did with the $20,054.56 was relevant to show his motive and intent. We think it quite relevant to inquire of Kelly what he knew of defendant's intention concerning the disposition of the money. In view of the failure of the defendant to prove he delivered the money to the senate finance committee, as he represented to Kelly, the prosecutor's suggestion, or "notion," even if improper at the time was not of such prejudicial magnitude requiring a mistrial.

Moreover, the jury was subsequently instructed (Tr. p. 944) as defendant requested, that "the use to which defendant put the money paid to him was not an issue in this case."

### REASON 5

■ Defendant argues that the testimony of Lawrence Williams about a telephone conversation with Leo Kelly was prejudicial in that it allowed the government to establish through Williams an element of fear in the victim Kelly which had not been established through Kelly's own testimony. In an extortion case where elements of fear or color of official right are involved, proof of the state of mind of the victim is relevant. This proof may come through the victim's own testimony or through testimony of statements made by him to others. United States v. Kennedy, 291 F.2d 457, 458 (2nd Cir. 1961). Of course, to be admissible, such testimony must not run afoul of the hearsay rule. In this instance, however, it does not matter whether or not the evidence is hearsay. Nuttall v. Reading Company, 235 F.2d 546, 551 (3rd Cir. 1956). McCormick, Evidence § 249 (2nd ed. 1972). One of the exceptions to the rule excluding hearsay allows a witness to testify to a statement of the declarant's then existing state of mind. Even if it is accepted that Williams' testimony about Kelly's statement was submitted to establish the truth of the matter asserted, the testimony was properly received under this exception.

■ Defendant's argument that the testimony was prejudicial is without merit for two reasons. First, the relevance of the testimony in showing Kelly's state of mind far outweighed any prejudicial effect; and second, the issue of fear on the part of Kelly never reached the jury because, at the close of the government's case, the defendant's motion for a judgment of acquittal was granted as to that portion of the indictment which charged that money had been extorted "by the wrongful use of fear."

### REASON 6

The defendant asserts the court erred in its ruling (Tr. pp. 703–708, 838–842) relative to the scope of cross-examination of defendant in the event he testified, which ruling "deprived defendant of the opportunity to testify on his own behalf."[6] Counsel for defendant specifi-

5. While discussing another matter on cross-examination, Mr. Kelly testified that he had gone to Harrisburg for the Senator's swearing-in, but that Kelly arrived late and missed the actual oath of office. Testimony by Mr. Creehan and Mr. Kelly indicated that they had knowledge that the defendant had sponsored the bill establishing the Lottery Commission in Pennsylvania. Even if the evidence presented was insufficient to prove

the defendant is a state senator, the evidence did provide a sufficient basis from which the court could take judicial notice of the fact that defendant took the oath of office after being elected to the Senate, and that at all times pertinent to this case he was a member of the Pennsylvania Senate.

6. See paragraph 6 of the defendant's motion for judgment of acquittal or in the alternative for a new trial.

cally stated he would limit "direct testimony of the defendant to the purpose for which the money was paid and the purpose for which he solicited it." (Tr. p. 838) The defendant contended that in light of this offer he could not be cross-examined relative to the use of the money he received from BMI. We disagree.

 It is well settled that when a defendant takes the stand on his own behalf he is subject to full cross-examination just as any other witness. United States v. Benson, 487 F.2d 978, 982 (3rd Cir. 1973); United States v. Lowe, 234 F.2d 919, 922 (3rd Cir. 1956). Regardless of whether we adopt the view which limits cross-examination to the subject matter of direct examination,[7] or the view which allows a witness to be cross-examined on any matters relevant to the case,[8] the testimony which apparently would have been elicited from defendant in light of his offer would have allowed the prosecution to proffer questions as to the ultimate use of the money. While it is true that the ultimate use of the money would not be a defense to the extortion charge, how the defendant disposed of the money would be relevant to the defendant's intent in soliciting and receiving the payments, the very matters which were to be the subject of defendant's "limited" direct examination. Such questioning would also be relevant as to the credibility of Mr. Kelly, who had testified that defendant told him it was the practice on all state leases that ten percent of the gross rental was payable to a senate re-election committee.

 We also disagree with defendant's contention that this refusal to limit cross-examination if defendant had taken the stand was in effect a denial of defendant's Fifth Amendment right against self-incrimination. Defendant's voluntary testimony on the matters described in his counsel's offer to the court would have been a waiver of his privilege as to all other relevant facts. Johnson v. United States, 318 U.S. 189, 195, 63 S.Ct. 549, 87 L.Ed. 704 (1943); United States v. Weber, 437 F.2d 327, 334 (3rd Cir. 1970); 8 Wigmore, Evidence (McNaughton Rev.1961) § 2276(2). To allow the defendant to testify as to his purpose in soliciting and receiving the payments, which defendant contended were simply political contributions, without allowing the prosecutor to probe this statement of purpose with relevant questions as to the ultimate disposition of the money would have distorted the factual picture before the jury.

Considering all of the above, we find no error in our refusal to limit the scope of cross-examination of the defendant.

## REASON 7

The defendant contends a mistrial should have been granted when the prosecutor argued that the taxpayers of Pennsylvania could have received the BMI leases for $20,000 less. We find no merit in the contention of the defendant.

 As to this contention the testimony of the defendant's witness, Coll, a field representative for the Bureau of Real Estate, Department of Property and Supplies, on cross-examination, responded in the affirmative to the question whether he would have been more satisfied if he could have obtained the leases from BMI for $20,000 less. (Tr. p. 790) He also testified he sought to get the lowest rental conforming to the standards and requirements of his agency. (Tr. p. 789) Therefore, the argument of the prosecution had an evidential basis. In any event, the remark was not of such prejudicial magnitude which would require a mistrial.

## REASON 8

The defendant asserts the court erred in refusing to charge as requested and

7. Federal Rules of Evidence, Rule 611(b) as approved January 2, 1975 (effective July 1, 1975).

8. United States v. Green, 373 F.Supp. 149, 154 (E.D.Pa.1974); Cf. United States v. Hykel, 461 F.2d 721, 728 (3rd Cir. 1972).

in failing to correct its charge as requested.

Specifically, the defendant excepted "to the failure to charge on the common law definition of extortion as opposed to the definition that the court has given." (Tr. p. 957)

He contends that under the common law definition of color of official right the jury should have been charged that the money received must have been claimed or accepted under right of office and the person paying must have yielded to official authority.

■ We do not find that there is as great a distinction as defendant contends between the common law and the law under the Hobbs Act in this regard.[9] However, the applicable law in this case was the Hobbs Act and our instructions fully covered the meaning of "extortion" as used in the Hobbs Act and conformed to the principles set forth by Mr. Justice Clark in *Braasch, supra,* 505 F.2d at 150–151. (Tr. pp. 942–943)

The defendant seems to except to the fact that the charge should have informed the jury to distinguish between "motivation for payment focused on the defendant's position" and "his ability to exert political influence." But the jury was told in emphatic terms that:

"If you [the jury] find from the evidence that BMI's treasurer, Mr. Kelly voluntarily made political contributions out of the funds of BMI, Inc. to the defendant for the re-election of incumbent state senators of both political parties and not as kickbacks demanded by the defendant for procuring state leases, you should find the defendant not guilty.

Political contributions made by a corporation may be illegal, but if these illegal contributions were freely and voluntarily made by the officers of BMI to the defendant, and not wilfully extorted by the defendant as kickbacks under color of official right, he is not guilty of extortion." (Tr. pp. 944–945)

■ The defendant also takes exception to the failure to charge on the offense of bribery. Since the defendant was not charged with bribery, such an instruction may have been confusing and certainly was unnecessary.

The defendant excepted "to the failure to charge that as to interstate commerce,—the government does have to prove that the defendant knowingly and directly involved himself in some way with the business of the corporation or the entity that he affected in commerce." Without repeating the instructions relating to interstate commerce (Tr. pp. 937–941 and Tr. pp. 943–944), in our opinion the jury was adequately instructed on the issues of interstate commerce.

■ As to the defendant's final general exception, we reiterate that there was no issue concerning a distinction between official duties and political functions. So long as the motivation for the payments focused on the Senator's office, the Hobbs Act is applicable. *Braasch, supra,* 505 F.2d at 151. The issue here was whether the defendant extorted money from BMI under color of official right.

### REASON 9

■ Individual questioning of every juror was not required in this case. Instead, the court addressed general questions to the entire array and followed-up by questioning individually those whose responses to any of the initial inquiries on pretrial publicity raised the possibility that they might have formed an opinion on the case. (Tr. pp. 61–70) This

---

9. In applying the common law definition of extortion, the Pennsylvania Superior Court upheld the conviction of a police official who had no lawful authority to grant the privilege sought by the victim of the extortion and who never actually declared that he had such authority, but whose conduct was tantamount to an assertion and use of his official authority as a cover for his act of obtaining a payment to which he was not entitled. Commonwealth v. Wilson, 30 Pa.Super. 26, 31 (1906). See the common law definition of extortion set out in footnote 4, *supra.*

method was in accord with recommended procedures outlined in the American Bar Association's Standards Relating to Fair Trial and Free Press § 3.4(a) approved by the Third Circuit in United States v. Addonizio, 451 F.2d 49, 67 (3rd Cir. 1972) for use by the district court's in this circuit. This same procedure was upheld in United States v. Liddy, 509 F. 2d 428 (D.C.Cir.1974).

Furthermore, when a publicity question arose during the trial, each juror was questioned individually under oath as to whether or not he or she had read or heard any such publicity. (Tr. pp. 748–757)

## REASON 10

■■■■ The traditional practice in this district in both state and federal courts is to have the prosecution, the party with the burden of proof in a criminal case, argue last to the jury. There was no error in following that practice in this case. The order of argument is a matter within the discretion of the trial court. United States v. El Rancho Adolphus Products, 140 F.Supp. 645, 649–650 (M.D.Pa.1956), aff'd, 243 F.2d 367 (3rd Cir. 1957).

## REASON 11

■■■ The court found the pretrial publicity to be neither extensive nor prejudicial. We still do not find it to be prejudicial and in our opinion there was no error in that regard.

## CONCLUSION

Additional errors were set forth in defendant's brief which were not raised in his formal motion for new trial. Practically every ruling adverse to the defendant was fully argued pro and con at the trial; the reasons for the rulings appear in the record and need no further discussion here. As to the additional allegations of error, we do not find them, either individually or cumulatively, to present sufficient grounds for a new trial.

An appropriate order will be entered.