**UNITED STATES of America**

v.

**Egidio CERILLI, Appellant in No. 78–2105.**

**Maylan Yackovich, Appellant in No. 78–2106.**

**John Shurina, Appellant in No. 78–2107.**

**Ralph Buffone, Appellant in No. 78–2439.**

**Nos. 78–2105 to 78–2107 and 78–2439.**

United States Court of Appeals, Third Circuit.

Argued Feb. 13, 1979.

Decided June 29, 1979.

---

6. *United States v. Welty,* 426 F.2d 615 (3d Cir. 1970), also cited by appellant, is distinguishable on the same grounds.

John Rogers Carroll (argued), Peter Goldberger, Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for appellants Cerilli, Yackovich and Shurina.

William F. Manifesto, Manifesto, Doherty, Love & Talarico, P. C., Pittsburgh, Pa., for appellant Buffone.

Robert J. Cindrich, U. S. Atty., Daniel H. Shapira (argued), Faye M. Gardner, James J. West, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

In recent years, much attention has been paid on the national level to the methods by which political parties finance their partisan activities and by which political leaders choose individuals for certain high-ranking positions. This case involves the relationship, on a local level, between the financing of political parties and the choice of individuals for certain not-so-high-ranking but sometimes lucrative work. Appellants Egidio Cerilli, Maylan Yackovich, Ralph Buffone, and John Shurina have been convicted and sentenced for conspiring to violate the Hobbs Act, 18 U.S.C. § 1951 [1] and for sub-

---

1. The Hobbs Act provides:
§ 1951. Interference with commerce by threats or violence
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.
(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.
Appellants Cerilli, Yackovich and Shurina were tried together. Appellant Buffone's case was severed from those of the other appellants when he became ill during trial. Buffone subsequently waived his right to a jury trial and entered into a stipulation with the government

stantive violations of that Act. We will affirm the respective judgments of sentence.

## I. FACTS

The appellants are employees of the Pennsylvania Department of Transportation (PennDOT) in Westmoreland County, District 12–5. Cerilli occupied the position of Superintendent while Buffone, Yackovich and Shurina were Assistant Superintendents.

In order to fulfill its snow removal and general road maintenance and repair responsibilities, PennDOT leases equipment from private owners. The leasing is accomplished at the discretion of the local superintendent and all such leases must be approved by the superintendent or his designee. The superintendent has the authority to negotiate rates for these leases up to a maximum rate set by the Department of Highways. Once a lease is signed, the amount of work for which a lessor's equipment is used is also determined at the county level.

A number of lessors testified at trial that one or more of the defendants required that payments be made as condition to the lessors' equipment being used.

Appellants do not challenge these basic facts. Instead they attack their convictions primarily on the theories that these facts do not constitute violations of the Hobbs Act and that the evidence was not sufficient to warrant conviction under the Hobbs Act

because appellants' participation in a conspiracy was not proved and because there was an insufficient effect on interstate commerce.[2]

## II. IS THE COERCIVE SOLICITATION OF POLITICAL CONTRIBUTIONS A VIOLATION OF THE HOBBS ACT?

Appellants contend that the payments they obtained were political contributions. The indictment does not specify for what purpose the payments were used. Testimony at trial established that some of the payments were in the form of checks made out to political committees. We will assume for the purpose of this discussion that these payments did constitute political contributions.

Appellants argue that since the Hobbs Act defines extortion as the "*wrongful* use of actual or threatened force, violence, or fear," (emphasis supplied), if the force, violence or fear is used for a lawful purpose, the use is not wrongful and extortion is not committed. Appellants submit that the solicitation of political contributions is not only lawful, but is protected by the First Amendment.[3] Appellants also argue that extortion "under color of official right" is likewise restricted to situations where the purpose for the obtaining of the payments is unlawful.

Appellants urge that their theory is supported by the Supreme Court's decision in *U. S. v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007,

---

whereby the testimony at the trial of the other appellants as well as the other appellants' objections and motions and the court's rulings prior to, at the time of, and post trial were made part of the record with respect to Buffone. Buffone was then found guilty by the district court and was sentenced. We have granted his motion to consolidate his appeal with those of the other appellants. He has adopted the briefs and appendix filed on behalf of the other appellants.

2. Appellants also argue:
 1. The failure of the evidence to establish that the payors were motivated by fear of economic loss warrants reversal.
 2. The failure of the evidence on Counts 6 and 12 to establish an attempt warrants reversal.

 3. The district court committed reversible error in admitting co-conspirator hearsay evidence without sufficient independent evidence of conspiracy.
 4. The district court committed reversible error in its instructions on specific intent, fear of loss of property and attempt.
 5. The district court abused its discretion in denying a continuance in response to Cerilli's mid-trial hospitalization.
We have considered these arguments and conclude that they are without merit.

3. The relationship between the solicitation here and the rights protected by the First Amendment is also the basis of appellants' claim, discussed *infra,* that the evidence against them must be scrutinized most closely under the doctrine of *strictissimi juris.*

35 L.Ed.2d 379 (1973). In that case, the indictment charged certain members and officials of labor unions with committing acts of violence and destruction against the property of the Gulf States Utilities Company in the course of a strike against that company in order to force that company to agree to a contract providing for higher wages and other benefits. The Court stated that "wrongful" as used in the Hobbs Act "limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. at 1009–1010. The Court concluded that where violence is used "to achieve legitimate union objectives . . . there has been no 'wrongful' taking of the employer's property; he has paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services." *Id.*

In reaching this conclusion the Court relied heavily on the legislative history of the Hobbs Act. Section 2 of the Anti-Racketeering Act of 1934, 48 Stat. 979, while similar to the Hobbs Act, contained an exception for the payment of wages by an employer to an employee. On the basis of this language, the Court in *U. S. v. Local 807*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942) held that a scheme by New York City teamsters to coerce payments from out-of-town drivers and owners for allowing their trucks to enter the city did not violate the Anti-Racketeering Act. In response, Congress passed what became the Hobbs Act. The legislative history made it clear that the new act reached extortion by union members "under the guise of obtaining wages." 91 Cong.Rec. 11900 as quoted in *U. S. v. Enmons*, 410 U.S. at 403, 93 S.Ct. at 1011. That history also made it clear that the new act "does not have a thing in the world to do with strikes." 91 Cong.Rec. 11912 as quoted in *U. S. v. Enmons*, 410 U.S. at 404, 93 S.Ct. at 1012.

The Court was quite explicit in stating its reluctance to construe the Hobbs Act as a method of regulating strike actions:

[I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

410 U.S. at 411, 93 S.Ct. at 1015.

We are thus confronted with the question of whether the political contributions here are sufficiently similar to the wage payments in *Enmons* to bring this case within *Enmons'* precedential orbit. We conclude that they are not.

Once a collective bargaining agreement is reached, it is generally impossible to determine what portion of the benefits, if any, are the result of violent action. Thus the Court in *Enmons* could properly conclude that the defendants there had a "lawful claim" to the wages they received. It is clear from this record, however, that the contributions were, in substantial if not total measure, a result of appellants' extortionate actions. Thus, although the solicitation of political contributions is not inherently "wrongful,"[4] the solicitations here were "wrongful" in that neither the appellants nor any political committee had a "lawful claim" to those contributions.

More importantly, *Enmons* is a labor case. The Court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context. Any application of *Enmons* to cases outside of that context must be done with caution. Otherwise there is a danger that *Enmons*, if read as the appellants read it, could effectively repeal the Hobbs Act. The receipt of money whether by a political party, a charitable institution or by an individual is generally

---

4. The jury was instructed, "Solicitation of political contributions or the sale of tickets is lawful conduct. . . ." Appellants' Appendix, p. 1256.

not inherently wrongful. The wrong under the Hobbs Act is the manner in which it is obtained. Thus we understand *Enmons* as not relying primarily on the legitimacy of the union's objectives but rather on the clear Congressional intent, as expressed both in the legislative history of the Hobbs Act and the entire federal scheme regulating labor-management relations, that violence during labor strikes not be punishable as extortion under the Hobbs Act. There is no corresponding intent to exempt the type of activity here from the ambit of the Act.[5]

■ It is well-established that a person may violate the Hobbs Act without himself receiving the benefits of his coercive actions. *See U. S. v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956), *U. S. v. Trotta*, 525 F.2d 1096, 1098 n.2 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *U. S. v. Provenzano*, 334 F.2d 678, 686 (3d Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). *U. S. v. Trotta* itself involved political contributions and the court there held that this fact did not alter the defendant's criminal liability.[6] This court in *U. S. v. Homer*, 545 F.2d 864 (3d Cir. 1976) (per curiam), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977), which involved the conviction of a state legislator under the Hobbs Act, stated that evidence that the defendant delivered the money he had extorted to the local party treasurer was not probative of the extortion charge and was therefore properly excluded. On the basis of this well-established line of case law, we conclude that the appellants' conduct here constituted extortion regardless of whether the payments went into appellants' pockets or their party's coffers.

■ Appellants argue that the passage of 18 U.S.C. § 601 indicates that Congress did not view the type of activity involved here as violating the Hobbs Act. § 601(a) provides:

Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by means of the denial or deprivation, or the threat of the denial or deprivation, of—

(1) any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work; or

(2) any payment or benefit of a program of the United States, a State, or a political subdivision of a State;

if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined not more than $10,000, or imprisoned not more than one year, or both.

The primary concern of Congress in passing § 601 was obviously with preventing government employees from having to

---

5. Appellants have suggested that 18 U.S.C. § 601 evidences such an intent. For the reasons given *infra*, we do not accept that contention.

6. In *U. S. v. Mazzei*, 521 F.2d 639 (3d Cir.) (in banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), payments were obtained in the guise of political contributions, but it was suggested at trial that the defendant might have "pocketed the money." *See U. S. v. Mazzei*, 390 F.Supp. 1098, 1106 (W.D.Pa.1975). Likewise, in *U. S. v. Rosa*, 560 F.2d 149 (3d Cir.) (in banc), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977), what the defendant did with the "donations" he extorted was unclear. Since we have assumed *arguen-*do that the payments here were actually political contributions, we do not rely on *Mazzei* and *Rosa* with respect to this point.

Neither do we believe, however, that *U. S. v. Sutter*, 160 F.2d 754 (7th Cir. 1947), cited by appellants, is relevant to our analysis. In that case, the defendant, a federal employee, obtained money claiming that it would be given to a variety of charitable causes. The court reversed his conviction because "the evidence wholly fails to show that the defendant used his employment to extort, but shows rather that he used appealing causes to defraud." 160 F.2d at 757. The appellants here clearly used their employment to extort. Therefore *Sutter* is inapposite.

make political contributions in order to obtain or retain their jobs. *See* S.Rep.No.94–1245, 94th Cong., 2nd Sess., reprinted in (1976) U.S.Code Cong. & Admin.News, p. 2883; H.R.Rep.No.94–986, 94th Cong., 2nd Sess. (1976). It is doubtful whether appellants could be prosecuted under this section since they obtained payments from lessors not employees. Section 601 is clearly not jurisdictionally co-extensive with the Hobbs Act. The jurisdictional basis for § 601 is that the employment, position, work, etc. must have been provided at least in part by an Act of Congress. This is in contrast to the Hobbs Act's jurisdictional requirement of an effect on commerce. We conclude that § 601 is Congress' attempt to deal with a problem related to but not identical with the problem at which the Hobbs Act is aimed. The passage of § 601 thus does not indicate that activities such as those in which appellants have engaged are not proscribed by the Hobbs Act. We hold therefore that the coercive solicitation of political contributions is within the realm of actions that are illegal under the Hobbs Act.[7]

## III. ADEQUACY OF THE EVIDENCE

### A. *Strictissimi Juris*

Having concluded that the relationship between appellant's actions and the political process does not insulate them, as a matter of substantive law, from Hobbs Act liability, we face their argument that this relationship at least affords them a measure of procedural protection. Appellants' contention is that since their "allegedly criminal conduct was inextricably linked to protected political activity . . . [t]he doctrine of *strictissimi juris* . . . requires the highest standard of proof to be applied to every question of sufficiency arising at the trial." Appellants' Brief, p. 51.

7. The district court's refusal to instruct the jury to the contrary is, therefore, not error.

8. The Smith Act, in relevant part, provides: Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such

This doctrine, which literally translated means "of the strictest right," apparently arose out of two Supreme Court cases reviewing convictions under the Smith Act, 18 U.S.C. § 2385. In *Scales v. U. S.*, 367 U.S. 203, 232, 81 S.Ct. 1469, 1487–88, 6 L.Ed.2d 782 (1961), the Court stated that "Smith Act offenses involving as they do subtler elements than are present in most other crimes, call for strict standards in assessing the adequacy of the proof needed to make out a case of illegal advocacy." The Court in *Noto v. U. S.*, 367 U.S. 290, 299–300, 81 S.Ct. 1517, 1522, 6 L.Ed.2d 836 (1961) ruled that the individual defendant's criminal intent like other elements of a violation of the membership clause of the Smith Act,[8] "must be judged *strictissimi juris*, for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share."

The doctrine was applied in *U. S. v. Spock*, 416 F.2d 165 (1st Cir. 1969), where defendants who had been involved in the formulation and distribution of "A Call to Resist Illegitimate Authority," were convicted of conspiring to aid others in refusing or evading registration of service in the armed forces in violation of 50 U.S.C. App. § 462(a). Partially as a result of the application of this doctrine, the convictions were vacated. The Seventh Circuit, in *U. S. v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973) which involved convictions under the Federal Anti-Riot Act, 18 U.S.C. §§ 2101, 2102, described the application of the doctrine in the following terms:

> society, group, or assembly of persons, knowing the purposes thereof—
> Shall be fined not more than $20,000 or imprisoned not more than twenty years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.

When the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment, the factual issue as to the alleged criminal intent must be judged *strictissimi juris*. This is necessary to avoid punishing one who participates in such an undertaking and is in sympathy with its legitimate aims, but does not intend to accomplish them by unlawful means. Specially meticulous inquiry into the sufficiency of proof is justified and required because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.

■ The coercive solicitation of appellants here is not the type of "bifarious undertaking . . . within the shadow of the first amendment" that warrants the application of the *strictissimi juris* doctrine. We need not sort out the subtle shadings of intent involved in *Scales, Noto, Spock,* and *Dellinger.* We need not seriously fear that convictions in cases such as this will chill the legitimate exercise of first amendment rights. Appellants have not been indicted for membership in a political party nor have they been indicted for their personal political preferences. They have been indicted for extortion. We are satisfied that the traditional standards of proof and of judicial review are fully adequate to protect appellants' rights without application of the doctrine of *strictissimi juris.*

### B. *Evidence of Conspiracy*

■ According to appellants, the evidence at trial "showed that the county superintendent of PennDOT and his assistants were committed to aggressive fundraising for the Democratic Party, but no agreement to extort, whether express or implied, was shown." Appellants' Brief, p. 39. We agree with the government that the evidence showed a great deal more than a commitment to aggressive fundraising.

"Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances'." *Glasser v. U. S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), quoting *U. S. v. Manton,* 107 F.2d 834, 839 (2d Cir. 1938) *cert. denied,* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). *Accord, U. S. v. Schoenhut,* 576 F.2d 1010, 1027 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978).

At trial, eleven lessors testified to the demands made of them by the appellants. Although the "shake-down" techniques were not always identical,[9] the basic pattern of appellants' demanding a specific amount, generally based on a percentage of the lessors' income under the lease, remained essentially constant. Particularly persuasive evidence of joint action is the testimony of several lessors who dealt with two or more of the appellants.

One lessor, Mr. James C. Poole, testified that Cerilli demanded $2,000 in cash from him and that Poole made this payment at Cerilli's home in the presence of Yackovich. William Ramaley testified that he met with Buffone who demanded $700 and that, during this meeting, Cerilli entered the room and was introduced to him. The following year Yackovich contacted him and demanded 5% of the amount Ramaley had received under his PennDOT lease in the last year.

Walter Seigfried testified that he met with Buffone who told him, "I am the hatchet man, we want 3% of what you made last year." After some argument, Seigfried agreed, but determined that 3% of his earnings came to $525 rather than the $750 that Buffone demanded. He, therefore, called Yackovich to make sure that the $525 figure was adequate. Yackovich, after coming to Seigfried's home and reviewing his records, accepted a check for $525.

---

**9.** For example, different lessors were asked for different percentages of their income under the leases. Also, lack of coordination among the appellants sometimes led to contradictory demands upon the same lessor.

Seigfried then met with Cerilli to determine when his equipment would be put back to work.

Paul Caletri testified that after Buffone or another assistant superintendent had demanded $125, he went to see Buffone, but was taken into Yackovich's office because Buffone was not in. Caletri complained that he had not earned $125 in the previous year and Yackovich looked at a ledger to determine how much Caletri had earned and when money was last demanded of him. Yackovich told him that he would have to discuss the matter with Cerilli and took Caletri into Cerilli's office. After a discussion with Cerilli, Caletri agreed to pay $75. At this meeting, Yackovich explained the initial $125 demand by stating that Buffone "had things all screwed up," but that the following year "things would be better."

There was also testimony from another Assistant Superintendent, Mario Bidese, that Cerilli, Yackovich and Buffone had given him instructions with respect to obtaining money from lessors. On another occasion, Yackovich instructed him to sell certain tickets that Cerilli had given Bidese, but not to sell them to the lessors because, according to Yackovich, "we'll take care of that." Bidese also testified that during 1971 and 1972 there were meetings between the superintendent and the assistant superintendents every week or every other week, that fundraising was. discussed at these meetings, and that Cerilli, Buffone and Yackovich made statements at these meetings to the effect that "the contractors weren't coming up with the money like they used to under the Republicans."

This evidence more than supports the finding of a conspiracy to extort money from the lessors and the participation of Cerilli, Yackovich and Buffone in this conspiracy.

■ The evidence of Shurina's participation in the conspiracy came primarily from Harry Graham, a PennDOT lessor, who testified that Shurina called Graham at his home and asked Graham to meet with him. At this meeting, Shurina told Graham that he owed $470. After Graham complained,

Shurina replied, "Well, I know what you made . . . I know how much your truck worked, and I know how much you made." Shurina then looked at something in his briefcase and repeated the demand for $470. Graham stated that he agreed to pay that amount "because I wanted to work." This testimony is clearly adequate to support Shurina's conviction on the substantive Hobbs Act count. We hold also that, because this transaction fits so closely into the pattern of extortion already described, it is an adequate basis upon which the jury could find that Shurina was a member of the conspiracy.

### C. Interstate Commerce

■ The evidence established that all the lessors had bought fuel for their equipment that had travelled in interstate commerce. Most of the lessors also testified that they had purchased equipment and/or supplies that had travelled in interstate commerce. Appellants argue that this evidence is insufficient to meet the interstate commerce component of the Hobbs Act. The Act punishes anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion. . ."

The Supreme Court has stated that this language manifests a Congressional purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. U. S.*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1959). In *Stirone*, a proprietor of a ready-mixed concrete business in Pennsylvania who brought sand from outside of Pennsylvania was the victim of extortion. The Court stated:

Had Rider's business been hindered or destroyed, interstate movements of sand to him would have slackened or stopped. The trial jury was entitled to find that commerce was saved from such a blockage by Rider's compliance with Stirone's coercive and illegal demands. It was to

free commerce from such destructive burdens that the Hobbs Act was passed. *Id.*

This court has held, "It is not necessary that the *purpose* of the extortion be to affect interstate commerce, . . . but only that one of the *natural effects* thereof be an obstruction of that commerce." *U. S. v. Addonizio,* 451 F.2d 49, 77 (3d Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). "[W]here the resources of an interstate business are depleted or diminished 'in any manner' by extortionate payments, the consequent impairment of ability to conduct an interstate business is sufficient to bring the extortion within the play of the Hobbs Act." *U. S. v. Mazzei,* 521 F.2d at 642; *U. S. v. Addonizio,* 451 F.2d at 77; *U. S. v. Provenzano,* 334 F.2d 678, 692–93 (3d Cir.) *cert. denied,* 379 U.S. 997, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). "[A]ll that is required to bring an extortion within the statute is proof of a reasonably probable effect on commerce, however minimal, as result of the extortion." *U. S. v. Spagnolo,* 546 F.2d 1117, 1119 (4th Cir. 1976) (per curiam) (footnote omitted), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977); *U. S. v. Santoni,* 585 F.2d 667, 672 (4th Cir. 1978). *See also, U. S. v. Nakaladski,* 481 F.2d 289 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); *Carbo v. U. S.,* 314 F.2d 718 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). "Congress was as much concerned with the threatened impact of the prohibited conduct as with its actual effect." *U. S. v. Staszcuk,* 517 F.2d 53 (7th Cir.) (in banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

The evidence presented at trial meets these tests. The payments made here clearly resulted in a depletion of resources thereby reducing the lessors' capacity to make their purchases of fuel and supplies in interstate commerce. Appellants contend that the "depletion of resources" test should only be applied where the victim of the extortion is itself an interstate business.

We reject such a limitation as being inconsistent with Congress' purpose "to use all the constitutional power Congress has to punish interference with interstate commerce . . . ." *Stirone v. U. S.,* 361 U.S. at 215, 80 S.Ct. at 272. We perceive no meaningful distinction between the effect on interstate commerce in the *Stirone* situation where money was extorted from a concrete supplier who bought sand from out of state and the situation here where fuel and supplies are purchased from out of state. This Court has already held that extorting money from a tavern owner has the natural effect of diminishing the owner's ability to purchase liquor originating in interstate commerce and this natural effect is a sufficient basis for conviction under the Hobbs Act even though there was no evidence of a decline in actual liquor purchases. *U. S. v. Starks,* 515 F.2d 112 (3d Cir. 1975).[10] In *U. S. v. Tropiano,* 418 F.2d 1069 (2d Cir. 1969), the court held that extortion from rubbish collection business limited that business' ability to purchase receptacles and trucks originating from out of state and that this was a sufficient effect on interstate commerce to support a Hobbs Act conviction. Although the effect on interstate commerce proven here is certainly not very large, the Hobbs Act does not proscribe only those extortions that have a large effect on commerce. Because there is adequate evidence to establish that there was *some* effect on commerce, the convictions here were properly supported.[11]

---

**10.** There was a decline in the victim's resales of liquor.

**11.** For the reasons given above, the district judge's instructions were also correct. The core of those instructions is contained in the following excerpt:

 I instruct you instead that you may find interstate commerce with the meaning of these instructions if you find beyond a reasonable doubt that the victim purchased goods in interstate commerce and that the money was extorted from him; then, as a matter of law, commerce was affected.

 The district judge's ruling as a matter of law that commerce was affected if the requisite facts were found by the jury is entirely proper. *See U. S. v. Lowe,* 234 F.2d 919 (3d Cir.), *cert.*

## IV. UNDER COLOR OF OFFICIAL RIGHT

 The dissent argues that this court and others have improperly held that, where extortion under color of official right is charged, one need not prove that the payment was obtained by force, fear or duress. See U. S. v. Kenny, 462 F.2d 1205 (3d Cir. 1972). Since the district judge instructed the jury on the basis of this circuit's well-settled law in this regard, the dissent contends that the appellants' conviction must be reversed.

Because this contention was not advanced by the appellants either in their briefs or at oral argument, we would generally not consider it on our own initiative. Also, the proof of coercion in this case is overwhelming. Moreover, as a panel, we are not free to overrule what the dissent recognizes to be the clear law of this circuit. Since we believe that this circuit has properly decided the question in issue here, we do not believe that rehearing in banc is necessary.

The Hobbs Act definition of extortion explicitly includes the obtaining of property by any of the following: "wrongful use of actual or threatened force, violence, or fear, *or* under color of official right."[12] Since the dissent argues that extortion under color of official right (at least outside of the context of an improper fee) requires proof of some element of coercion, it is essentially arguing that a disjunctive reading of the relevant statutory language is incorrect. Professor Ruff, upon whose writing the dissent heavily relies, states:

This task [of asserting that a disjunctive reading of the Hobbs Act is improper] is complicated, however, by the necessity of arguing not that an alternative interpretation of the operation language is more consistent with the legislative intent, *but that the language, in effect, should be struck from the Act.* If one adopts the usual course and attempts to give meaning to all the statutory language, it is hard to challenge the result reached by the courts.[13]

The argument that these words should be, by judicial fiat, "struck from the Act," is based on the Hobbs Act's legislative history. Yet the dissent concedes that there is no explicit discussion anywhere in the legislative history of the "under color of official right" language. The dissent asserts, however, that the statutory language was in large part derived from New York's extortion statute and that New York courts have drawn a sharp distinction between bribery and extortion. The cases cited by the dissent on this point, however, were decided *after* the enactment of the 1934 statutory predecessor to the Hobbs Act that is the source of the "under color of official right" language and, therefore, these cases shed no light on the congressional purpose behind this language. While it is true that the New York statute defined extortion under color of official right rather narrowly, we are not prepared to incorporate that narrow definition at this time. Before a court decides that such broad language was intended to have so constricted a meaning, more explicit direction must be available either in the form of actual statutory language or persuasive legislative history. We have neither here. Moreover, all the circuit courts that have addressed the issue have agreed with this court's interpretation in *Kenny.* See cases cited by the dissent at p. 427 n.5. Although modern theories of statutory construction have advanced the state of the art significantly in recent years, we believe that it is still proper for a court to construe an unambiguous statute according to the clear meaning of its terms particularly where every other appellate court has so construed it and where, despite the dissent's assertions, the legislative histo-

---

denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956); *U. S. v. Augello,* 451 F.2d 1167, 1170 (2d Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972).

**12.** 18 U.S.C. § 1951(b)(2) (emphasis supplied). The full text is set out in note 1, *supra.*

**13.** Ruff, *Federal Prosecution of Local Corruption,* 65 *Georgetown Law Journal* 1171, 1197 (1977) (emphasis supplied).

ry is silent as to any contrary congressional intent. If language is to be "struck from the Act," this is work for the Congress, not for the courts.

V. CONCLUSION

For the foregoing reasons, appellants' judgments of sentence will be affirmed.

ADAMS, Circuit Judge, concurring.

I concur in the result reached by Judge Higginbotham, and join in his fine opinion. I write separately in order to note that in light of the issue raised and arguments advanced by the dissent, it was and is my view that the Court should rehear this case *en banc*.[1]

The point raised by the dissent was not presented in the trial court, nor was it briefed or argued in this Court. If a panel of this Court is to resolve a criminal appeal on the basis of its answer to this question, it seems unwise, at least to me, to fail to give the parties an opportunity to address it. For an appellate court to decide an important matter such as the present one, *sua sponte*, without the benefit of argument by counsel, is, I believe, neither in the interest of the parties nor the judicial system.

Having noted my position in this regard, I am of the view that the approach previously taken by this Court, by all other courts that have considered the question,

and by the majority here, is correct: the Hobbs Act may be used to reach the type of activity involved in the present case. But I do not pretend to be so certain of my understanding of the statute and the intent of Congress in enacting it that I am prepared to dispense with the assistance of the parties in deciding the issue. It is a basic premise of our legal system that judges are open to persuasion and that it is the role of the advocate to persuade them. In the present case the appellants find themselves confronted with a decision apparently turning on our legal judgment concerning an issue that they, for understandable reasons,[2] have not addressed. However confident we may be of the rightness of our conclusions, we ought not to adhere to them without affording the parties an opportunity to brief and argue a controlling issue that was not injected into the case until after the argument.

ALDISERT, Circuit Judge, dissenting.

It is now seven years since this court decided the seminal case of *United States v. Kenny*, 462 F.2d 1205 (3d Cir. 1972), announcing a revolutionary interpretation of the Hobbs Act, 18 U.S.C. § 1951.[1] We stated therein that a Hobbs Act violation based on extortion by a public official need not include proof of threat, fear or duress.

---

1. *Internal Operating Procedures of the Third Circuit*, VIII.

2. The parties apparently did not address the issue raised by the dissent because they believed the question to have been definitively resolved by this Court. *See United States v. Kenny*, 462 F.2d 1205 (3d Cir. 1972). *See also* cases cited in dissenting opinion, n.5. Under the rules of this Court (*Internal Operating Procedures of the Third Circuit*, VIII C), a panel must adhere to the Court's precedent, which may be overturned only by the Court sitting *en banc*. Because *Kenny* is binding here—as even the dissent, despite its advocacy of reversal, appears to agree—rehearing before the original panel would be of little practical utility. If the arguments raised by the dissent—which were not raised before the Court in *Kenny*—have merit, only the full Court can reverse that result. Of course, if *Kenny* were not controlling here, the panel, if it were so inclined, could reverse the conviction on the basis of the dissent's analysis, and no *en banc* rehearing would

. be necessary in order to evaluate those arguments.

1. 18 U.S.C. § 1951 provides:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 (b) As used in this section—

 . . . . .

 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

We found no error in the following jury instruction: "Extortion under color of official right is the wrongful taking by a public officer of money not due him or his office, whether or not the taking was accomplished by force, threats or use of fear."[2]

I describe our decision as revolutionary because it became the country's landmark case interpreting extortion under the Hobbs Act and departed completely, without benefit of in banc rehearing, from Judge Rosenn's opinion for the panel in *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), in which, discussing extortion by the mayor of Newark, it was stated that *"while the essence of bribery is voluntariness, the essence of extortion is duress."* (Emphasis added).

I believe this court was right in *Addonizio*, and that *Kenny* erred both in determining the substantive law and in reversing a panel decision without in banc considera-

2. 462 F.2d at 1229.

3. The trial judge charged: "Color of official right is defined as the taking by a public official of money not due him or his office, whether or not the taking was accomplished by force, threats or the use of fear." App. at 1255. The appellants requested the following point for charge: "Color of official right in this Statute demands proof by the Government of a wrongful use of public office, that is, a coercive or oppressive use of office. The mere fact that a Defendant held a public office and asked for money is not sufficient, there must be involved a misuse of his office for an improper purpose, i. e., to obtain money not due to that office or on account of it." App. at 46.

4. I readily acknowledge that I had the opportunity of taking my present stand in earlier cases of this court, particularly in *United States v. Mazzei*, 521 F.2d 639 (3d Cir.) (in banc), *cert. denied*, 433 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), in which I joined Judge Gibbons' dissent, an opinion that, in my view, moved somewhat nearer the view I now adopt, but which nevertheless respected the vitality of *Kenny*. A famous statement of Justice Frankfurter provides me refuge: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Bank*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (dissenting).

5. *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Trot-*

tion. I would cure our error by having the full court reexamine the *Kenny* rule in this case, and order a new trial because the trial judge gave a *Kenny* charge and refused an *Addonizio* point for instruction.[3]

It is now my view that our interpretation in *Kenny* and its progeny is not supported by the legislative intent underlying the Hobbs Act nor is it historically accurate.[4] I believe that our failure to reexamine its rationale has resulted in a perpetuation of erroneous law not only in this circuit but in the First, Second, Fourth, Seventh, Eighth and Tenth Circuits which have followed our lead without setting forth a reasoned elaboration for their conclusions.[5]

### I.

A year after deciding *Addonizio*, with less than one page of discussion we affirmed the extortion conviction of a public official without "proof of threat, fear, or duress."

*ta*, 525 F.2d 1096, 1099–1100 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Price*, 507 F.2d 1349, 1350 (4th Cir. 1974); *United States v. Staszcuk*, 502 F.2d 875, 877–78 (7th Cir. 1974), *rev'd in part on other grounds en banc*, 517 F.2d 53 (1975), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1976); *United States v. Brown*, 540 F.2d 364, 372 (8th Cir. 1976); *United States v. Hall*, 536 F.2d 313, 320–21 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

With the exception of *Price* (4th Cir.), all of the opinions cited *Kenny* without providing further elaboration of the reasons for the disjunctive reading of the "use of office" and the "duress" elements of extortion. *Price* cited no authority and stated no rationale.

In *United States v. Harding*, 563 F.2d 299, 302–07 (6th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), the Sixth Circuit discussed at length the legislative history of the Hobbs Act, the common law offense of extortion, the law of extortion and bribery in New York and other states, as well as *Corpus Juris Secundum* and *Black's Law Dictionary* in reaching the conclusion that "color of official right" need not be accompanied by "threats, force or duress." The analysis is similar to that in *Kenny*, and provides no independent reason justifying federal intervention in prosecuting local corruption such as that in the case at bar.

*Kenny,* 462 F.2d at 1229. We said, "But while private persons may violate the statute only by use of fear and public officials may violate the act by use of fear, persons holding public office may also violate the statute by a wrongful taking under color of official right." *Id.* Authority for this disjoinder of the "force, violence, or fear" and the "color of official right" phrases of § 1951(b)(2) was said to be found in *United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969); *United States v. Sutter,* 160 F.2d 754, 756 (7th Cir. 1947); *State v. Begyn,* 34 N.J. 35, 167 A.2d 161 (1961); and *State v. Weleck,* 10 N.J. 355, 91 A.2d 751, 759–760 (1952).

*Nardello* was an extortion case brought under the Travel Act, 18 U.S.C. § 1952, holding that extortion under the Act encompasses acts of private individuals who obtain money by virtue of fear and threats. The decision was essentially an interpretation of the § 1952(b)(2) proscription of "extortion . . . in violation of the laws of the State in which committed or of the United States." Rejecting petitioners' contention that their conduct was blackmail, not extortion, under Pennsylvania statute, the Court defined the federal crime of extortion:

> Prosecutions under the Travel Act for extortionate offenses involving only private individuals have been consistently maintained. . . . Although only private individuals are involved, the indictment encompasses a type of activity generally known as extortionate since money was to be obtained from the victim by virtue of fear and threats of exposure. . . . [W]e decline to give the term "extortion" an unnaturally narrow reading, . . . and thus conclude that the acts for which appellees have been indicted fall within the generic term extortion as used in the Travel Act.

*Nardello, supra,* 393 U.S. at 295–96, 89 S.Ct. at 539. Clearly, the decision was tied to the *Travel Act* prohibition of extortion, and nowhere supports the notion that public officials may commit extortion without threat, fear or duress under § 1951.

*Sutter* reversed the conviction of a federal employee charged with violating 18 U.S.C. § 171, a statute which prohibited, but did not define, extortion. The court reasoned that because "[t]here are no common law crimes within the jurisdiction of the Federal Government," and because "Congress did not see fit to define extortion in the terms known to the common law . . . extortion is used in its common, ordinary sense as distinguished from the sense in which it was known at common law." *Sutter,* 160 F.2d at 756. After quoting Webster's definition of extortion, the court held,

> Under this statute, a Federal employee is guilty only if he uses his office to place another under compulsion of fear, force or the undue exercise of power, so that such person parts with something of value unwillingly and involuntarily. It is the oppressive use of official position that is the essence of this offense.

*Id.*

*State v. Begyn,* in *obiter dictum,* briefly discussed extortion under New Jersey statute and common law even though Begyn had not been tried for extortion. *State v. Begyn,* 167 A.2d at 166–67. *State v. Weleck,* likewise, discusses New Jersey statutory and common law extortion. Neither of these cases should be a ground for the interpretation of a federal statute enacted years before the cases were decided.

All of this might be relevant to the interpretation of 18 U.S.C. § 1951 if it were assumed that the Hobbs Act incorporated the common law definition of extortion. Unfortunately, the cases cited by the *Kenny* court beg that question. Indeed, the Supreme Court in *Nardello* held that the Travel Act offense of extortion was *not* equivalent to the common law offense as did the Seventh Circuit in *Sutter* as to 18 U.S.C. § 171.[6]

A brief passage from *State v. Begyn, supra,* shows the fragility of its relevance to the *Kenny* conclusion:

---

6. The dictum in *Sutter* is discussed in part V, *infra.*

The essence of [extortion under the common law] was the receiving or taking by any public officer, by color of his office, of any fee or reward not allowed by law for performing his duties. The purpose would seem to be simply to penalize the officer who non-innocently insisted on a larger fee than he was entitled to or a fee where none was permitted or required to be paid for the performance of an obligatory function of his office. The matter was obviously of particular importance in the days when public officials received their compensation through fees collected and not by fixed salary. Our early cases dealt with precisely this kind of a situation.

*Begyn, supra,* 167 A.2d at 166. Obviously, that common law definition was of less importance when public officials received salaries, so that "[i]n many States . . . the crime of extortion has been statutorily expanded to include acts by private individuals under which property is obtained by means of force, fear, or threats." *Nardello, supra,* 393 U.S. at 286, 89 S.Ct. at 536. *Nardello,* adopted the government's suggestion that under the Travel Act, "Congress intended that extortion should refer to those acts prohibited by state law which would be generically classified as extortionate, *i. e.,* obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Id.* at 290, 89 S.Ct. at 536. Such crimes are called extortion, blackmail, theft by intimidation, or are classified "under the general heading of offenses directed against property." *Id.* at 288–90, 89 S.Ct. at 536.

Such an interpretation makes sense due to the Travel Act's proscription of "extortion, bribery, or arson," making all three punishable by a maximum of five years imprisonment. 18 U.S.C. § 1952(b)(2). It would not make sense under the Hobbs Act, which prohibits only robbery and extortion, making both punishable by twenty years imprisonment. Recognizing that the Hobbs Act requires a distinction between behavior which constitutes bribery and acts constituting extortion, I believe it is also essential to distinguish common law extortion from the crime that Congress intended to punish under the Hobbs Act.

## II.

At bottom, then, we are faced with the interpretation of a criminal statute. I am quick to concede that a purely semantic approach to the statutory language can substantiate a decision that no duress need be proved because the statute provides: "induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." In an earlier era of our jurisprudential tradition this literal interpretation might have carried.

In 1899 Holmes lamented, "We do not inquire what the legislature meant; we ask only what the statute means."[7] He would not voice this complaint today, for although contemporary courts are fond of stating that "[t]he starting point in every case involving the construction of a statute is the language itself,"[8] methodology now appears to abjure a strictly semantic approach. We have played with the Mischief Rule of Heydon's case,[9] the Golden Rule,[10] and the Literal Rule.[11] We have dallied with what American jurisprudence has called the "Plain Meaning Rule."[12]

Impressive authorities have warned us not to depend too much on the actual lan-

---

7. Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 419 (1899).

8. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979).

9. 3 Co. 7a, 76 Eng.Rep. 637 (Ex. 1584).

10. *See, e. g., River Wear Commissioners v. Adamson,* 2 App.Cas. 743, 764-65 (1877) (Lord Blackburn).

11. *See, e. g., Vacher & Sons, Ltd. v. London Society of Compositors,* [1913] A.C. 107, 121–22 (Lord Atkinson).

12. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (Day, J.); *see Hamilton v. Rathbone,* 175 U.S. 414, 419–21, 20 S.Ct. 155, 44 L.Ed. 219 (1899) (Brown, J.).

guage of a statute. Cardozo said that "[w]hen things are called by the same name, it is easy for the mind to slide into an assumption that the verbal identity is accompanied in all its sequences by identity of meaning." [13] Holmes told us: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." [14] Learned Hand said "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." [15]

Current wisdom requires judges to ascertain the "legislative intent," a task somewhat akin to pinpointing the intent of a testator or of disputing parties to a contract. Proper judicial construction, in the modern view, requires recognition and implementation of the underlying legislative purpose; the judge, the theory holds, must accommodate the societal claims and demands reflected in that purpose.[16] To do this, as Justice Roger J. Traynor puts it, we need "literate, not literal" judges,[17] lest a court make a construction within the statute's letter, but beyond its intent.[18]

This approach to statutory precept demonstrates a fundamental difference in the judicial process today from that of a half century past. Today, what the legislature has said is not as important as what it intended. Its words will be respected, it is true, but its intentions will be discovered and given equal, if not superior, respect. Very seldom do we now encounter the watchwords of another day: "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning." [19] Rather, we now say, "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " [20] That we no longer follow the rigid semantic approach is sound, because in the common law tradition a rule from case law is never considered *in vacuo*. The *reason* for the rule is *always* considered. In sum, the purpose, the subject matter, the context, and the legislative history appear to be the major aids in considering statutory precept today. It is to the legislative history of the Hobbs Act that I now turn.

### III.

Judge Gibbons' dissenting opinion in *United States v. Mazzei*, 521 F.2d 639, 651–55 (3d Cir.) (in banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), sets forth in detail the legislative history of 18 U.S.C. § 1951(b)(2), the extortion section of the Hobbs Act under which appellants were convicted. A summary of the impor-

13. *Lowden v. Northwestern Nat'l Bank & Trust Co.*, 298 U.S. 160, 165, 56 S.Ct. 696, 699, 80 L.Ed. 1114 (1936).

14. *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).

15. *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

16. *See Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). See also Levi, *An Introduction to Legal Reasoning*, 15 U.Chi.L. Rev. 501, 520–23 (1948); Murphy, *Old Maxims Never Die: The "Plain-meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts*, 75 Colum.L.Rev. 1299, 1316-17 (1975).

17. Traynor, *Reasoning in a Circle of Law*, 56 Va.L.Rev. 739, 749 (1970).

18. *See, e. g., Muniz v. Hoffman*, 422 U.S. 454, 469, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848–49, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Philbrook v. Glodgett*, 421 U.S. 707, 713-14, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).

19. *Caminetti v. United States*, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917).

20. *Train v. CPIRG, Inc.*, supra note 16, 426 U.S. at 10, 96 S.Ct. at 1492.

tant points in that discussion will be sufficient.

The word "extortion" first appeared in the Anti-Racketeering Act of 1946 [21] which amended the Anti-Racketeering Act of 1934.[22] Although the 1934 statute did not use the term, it did proscribe what must have been intended as common law extortion, that is, obtaining property "under color of official right." The latter language has been carried forward without change since the initial Act so that whatever congressional intention may be ascribed to that term must be found in the records of the Seventy-third Congress.

Nothing in the legislative history shows that the 1934 Act was intended to permit federal authorities to police influence peddling in the political processes of the states. Indeed, whatever legislative history there is suggests a contrary conclusion. The 1934 Act originated in the Senate as S. 2248, 73d Cong., 2d Sess. (1934), *reprinted in* 78 Cong. Rec. 457–58 (1934), and contained no reference to extortion by "color of official right." After passing the Senate, 78 Cong. Rec. 5734 (1934), it was submitted in the House, where it was completely amended and a new bill substituted. The reasons for this amendment have been described by the Supreme Court in *United States v. Teamsters Local 807*, 315 U.S. 521, 529, 62 S.Ct. 642, 645, 86 L.Ed. 1004 (1942), as follows:

> After the bill had passed the Senate, however, representatives of the American Federation of Labor expressed fear that the bill in its then form might result in serious injury to labor, and the measure was redrafted by officials of the Department of Justice after conferences with the President of the Federation.

With the House revision the term "color of official right" appeared for the first time.

The House Report, submitted along with its new version of S. 2248 (H.R. 6926), was short. In addition to the text of the new bill, it reprinted a letter written by the Attorney General to the Chairman of the House Judiciary Committee. H.R.Rep. No.

1833, 73d Cong., 2d Sess. 2 (1934). In *United States v. Teamsters Local 807*, the Supreme Court placed heavy emphasis on this letter as a tool to interpret the 1934 Act. The substance of the letter is contained in these paragraphs:

> The original bill was susceptible to the objection that it might include within its prohibition the legitimate and bona fide activities of employers and employees. As the purpose of the legislation is not to interfere with such legitimate activities but rather to set up severe penalties for racketeering by violence, extortion, or coercion, which affects interstate commerce, it seems advisable to definitely exclude such legitimate activities.
>
> As the typical racketeering activities affecting interstate commerce are those in connection with price fixing and economic extortion directed by professional gangsters, we have inserted subparagraphs (a) and (b), making such activities unlawful when accompanied by violence and affecting interstate commerce.
>
> The Sherman Antitrust Act is too restricted in its terms and the penalties thereunder are too moderate to make that act an effective weapon in prosecuting racketeers. The antiracketeering bill would extend the Federal jurisdiction in those cases where racketeering acts are related to interstate commerce and are therefore of concern to the Nation as a whole.

Judge Gibbons' opinion pointedly referred to a comment by Congressman Oliver of New York, during the floor debate after the bill had cleared committee: "This is merely the creation of an extortion statute against those who extort money by force or violence from those engaged in interstate commerce." 78 Cong.Rec. 11402 (1934).

The drafters of the 1934 Act took the term "color of official right" from the New York Penal Law of 1909 which defined the crime of extortion as follows:

21. Act of July 3, 1946, ch. 537, 60 Stat. 420.

22. Act of June 18, 1934, ch. 569, 48 Stat. 979.

Extortion is the obtaining of property from another, or the obtaining the property of a corporation from an officer, agent or employee thereof, with his consent, induced by a wrongful use of force or fear, or under color of official right.[23]

Compare this language with § 2(b) of the 1934 Act:

Obtains the property of another, with his consent, induced by wrongful use of force and fear, or under color of official right;

The similarity between the definitions is consistent with legislative history. Congressman Hobbs of Alabama, sponsor of the bill, stated that "there is nothing clearer than the definitions of robbery and extortion in this bill. They have been construed by the courts not once, but a thousand times. The definitions in this bill are copied from the New York Code substantially." 91 Cong.Rec. 11900 (1945). Congressman Hancock of New York stated: "The bill contains definitions of robbery and extortion which follow the definitions contained in the laws of the State of New York." *Id.* Judge Gibbons summed up the relevance of New York law as follows:

While the meaning attributed to the term "color of official right" by the New York legislature and courts is by no means dispositive of the congressional intent in using the phrase, it is highly persuasive both because its meaning in New York has long been settled and because the legislative history indicates no intention to change that meaning.

521 F.2d at 653. It is therefore critical to examine the New York law of extortion.

### IV.

Advice has been offered by Professor Charles F. C. Ruff, former Director, Watergate Special Prosecution Force, that New York made a clear distinction between extortion "by a wrongful use of force or fear," which was punishable as a felony, and extortion "under color of official right" which was a misdemeanor:

Extortion under color of official right was in turn divided into two parts: oppression, defined as the unlawful and malicious arresting of an individual or seizure of his property,[75] and extortion, defined as a public officer's asking, receiving, or agreeing to receive a fee in excess of that allowed by statute or when no such fee is authorized.[76] Both of these offenses were misdemeanors, whereas the larceny-type offenses were felonies carrying sentences of up to twenty years in prison.[77]

[75] See N.Y. Penal Law app. § 854 (McKinney 1967).

[76] *Id.* § 855.

[77] *Id.* § 852.[24]

The relationship of the New York Penal Code to the Hobbs Act definition of extortion is of paramount importance in considering the elements of the § 1951 offense because of two fundamental precepts of statutory interpretation. First, it is elementary that the ultimate aim is to ascertain the intention of Congress in the enactment of a statute, and that intention, when discovered, must prevail. "In the interpretation of statutes, the function of the court is easily stated. It is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Associations*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). Second, any ambiguity which exists in a penal statute must be construed in favor of the defendant. Chief Justice Marshall stressed the predominance of this rule over other "maxims or rules for the construction of statutes":

The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is

---

**23.** Penal Law of 1909, § 850, as amended, Laws of 1917, ch. 518, reprinted in N.Y. Penal Law, appendix § 850 (McKinney 1967).

**24.** Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy*, 65 Georgetown L.J. 1171, 1183 (1977). Professor Ruff is now Assistant Deputy Attorney General of the United States.

vested in the legislative, not in the judicial department.

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). The Supreme Court has reaffirmed Chief Justice Marshall's admonition consistently through the years, as recently as *United States v. Naftalin*, —— U.S. ——, ——, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). For our purposes, the reasons for the rule are as important as the rule itself. An examination of these reasons demonstrates that this court did violence both to the rule and its reasons when we opted for the broad interpretation of extortion in *Kenny*. When a choice is to be made between two readings of a federal criminal statute, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

I believe that the congressional intent underlying the Hobbs Act is clearly and unambiguously disclosed by its legislative history. Not only is there a total lack of specific congressional intent that the Act apply to state and local public officials in the absence of violence or coercion, but the legislative history indicates that Congress intended to rely on the New York law of extortion for its definition of the crime. To hold otherwise is to defy the Supreme Court's admonition that "because criminal punishment usually represents the moral condemnation of the community, *legislatures and not courts* should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (my emphasis). It is said that this policy embodies an instinctive revulsion against men languishing in prison unless the lawmaker has clearly said they should. *Id.* Thus, one of the basic errors we committed when we embarked on the *Kenny* journey was to ignore the mandate that "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 285, 98 S.Ct. 566, 573, 54 L.Ed.2d 538 (1978).

Extortion under color of official right under the New York schema must implicate (1) oppression, as therein defined, and not applicable in *Kenny* or here, (2) extortion in the sense of the original common law formulation, defined as a public officer's asking, receiving, or 'agreeing to receive a *fee* where no fee is authorized or in excess of that allowed by statute, or (3) extortion by wrongful use of force or fear. Unless money is received under a specific misrepresentation that it is an authorized fee, a public official cannot be guilty of extortion under New York law in the absence of duress.

The salient feature of New York extortion law is the unusually clear distinction between the offenses of bribery and extortion. This is manifested in *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960), which held that bribery and extortion were "mutually exclusive crimes" and that a defendant charged with extortion was entitled to acquittal if the jury found that he had been bribed. *Id.*, 8 N.Y.2d at 273–74, 203 N.Y.S.2d at 881–82, 168 N.E.2d at 692. The court reasoned that bribery "makes the payor equally as guilty as the payee, *which could never be the case with extortion*," and that the *payee* could not be guilty of extortion if the *payor* were guilty of bribery, *id.* (emphasis added), relying on *People v. Feld*, 262 App.Div. 909, 28 N.Y.S.2d 796 (1941), and on *Hornstein v. Paramount Pictures*, 22 Misc.2d 996, 1003, 37 N.Y.S.2d 404, 412 (Sup.Ct.1942), aff'd 266 App.Div. 659, 41 N.Y.S.2d 210, aff'd, 292 N.Y. 468, 55 N.E.2d 740, both of which were decided well before the enactment of the Hobbs Act. The holding of *People v. Feld* was that bribery of a labor representative and extortion were mutually exclusive crimes; *Hornstein* held that "the essence of bribery is the *voluntary* giving of something of value to influence the performance of *official duty*, whereas the essence of extortion is duress." *Dioguardi, supra*, 203 N.Y.S.2d at 882, 168 N.E.2d at 692.

Although this nuance of New York law has been criticized as a "*unique* interpretation" which should not restrict federal

courts applying the Hobbs Act,[25] I believe it is totally consistent with the common law origins of the offenses. Moreover, congressional reliance on New York law demands adherence to that interpretation, however it may differ from the law of other states.

## V.

Our conclusion in *Kenny* is not justified by any reference to the common law origins of the crimes of extortion and bribery. I make this statement with full awareness that true common law definitions are somewhat elusive.

The historical basis of extortion, a common law misdemeanor, was the corrupt collection of an unlawful *fee* under color of public office.[26] The requirement that the unlawful fee be associated with the office held by the recipient is central to an understanding of the traditional Blackstonian definition generally expressed in broader language. Professor Perkins advises:

A fee collected under color of office is unlawful if—(1) the law does not authorize a fee for the purpose for which this fee is collected, or (2) a fee is authorized but only in an amount smaller than that collected, or (3) a fee might be authorized but none was due at the time this fee was collected. For this reason Blackstone defined extortion as "an abuse of public justice, which consists in any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value that is not due to him, or more than is due, or before it is due." Since a fee is unlawful under any one of the three circumstances the simpler wording is preferred for purposes of definition.[27]

Against the backdrop of this common law history, it becomes important to understand exactly what Judge, later Justice, Minton meant in *United States v. Sutter, supra,* when, in dictum, he stated that at common law "color of public office took the place of the force, threats, or pressure implied in the

**25.** Stern, *Prosecution of Local Political Corruption Under the Hobbs Act: The Unnecessary Distinction Between Bribery and Extortion,* 3 Seton Hall L.Rev. 1, 13 (1971).

**26.** Perkins on Criminal Law 367 (2d ed. 1969). Similarly, it is said that "[t]he common-law misdemeanor of extortion consists of the corrupt taking of a fee by a public officer, under color of his office, where no fee is due, or not so large a fee is due, or the fee is not yet due." W. LaFave and A. Scott, Handbook on Criminal Law 704 (1972). It is also emphasized that at common law the money or property he obtained "under the pretense that the officer was entitled thereto by virtue of his office." III R. Anderson, Wharton's Criminal Law and Procedure 790–91 (1957).

**27.** *Id.* at 367–68 (footnotes omitted). Professor Ruff reports:

The historical roots of this offense may be traced to the Roman *leges repetundarum,* which, beginning in 171 B.C., prohibited magistrates and, later, other public officials from profiting by their positions. A comparable offense appeared in England as early as 1275. Chapter 26 of the Statute of Westminster I, entitled "Extortion by the King's Officers," provided in part that "no Sheriff, nor other the King's Officer, take any reward to do his Office, but shall be paid of that which they take of the King; and he that so doth, shall yield twice as much, and shall be punished at the King's Pleasure." The bulk of this statute still remains in force, although its specific references to sheriff and coroners have been recodified in other legislation.

The earliest recorded decision interpreting the extortion provision of the Statute of Westminster I arose in the context of a civil suit by Lewis Dive, sheriff of Bedford, against John Maningham in the amount of 40 pounds, representing a bond for the release pending trial of a prisoner in the sheriff's custody. In finding for the defendant, Chief Justice Mountague concluded, in part, that the plaintiff had demanded payment improperly *colore officii* and stated:

[For] this Word *colore officii sui* is always taken *in malem partem,* and signifies an Act badly done under the Countenance of an Office, and it bears a dissembling Visage of Duty, and is properly called *Extortion.* As if an Officer will take more for his Fees than he ought, this is done *colore officii sui,* but yet it is not Part of his Office, and it is called Extortion, which is no other than Robbery, but it is more odious than Robbery, for Robbery is apparent, and always hath the Countenance of Vice, but Extortion, being equally as great a Vice as Robbery, carries the Mask of Virtue, and is more difficult to be tried or discerned, and consequently more odious than Robbery.

Ruff, *supra* note 24, at 1179–80 (footnotes omitted).

ordinary meaning of the word extortion." [28] If this statement means that no force, threat, or pressure need be proved if the officer charged an official fee when none was required by law or charged a fee larger than that provided by law, it is proper. But if, outside the context of charging an improper fee for the mandatory performance of official duty, the statement means that one need not prove force, fear or duress at common law to prove wrongdoing on the part of an official, then I agree with Professor Ruff that this is "an explanation wholly at odds with the true common law origins of the offense." [29] That a number of courts have subsequently parroted Minton's formulation [30] does not legitimate what was illegitimate when first uttered. Error is not cured by repetition.

On the other hand, the common law misdemeanor of bribery is an offense which may be committed both by the giver and the recipient. It originated as an offense which could only be committed by a judge or other person concerned with the administration of justice but was broadened in the eighteenth century to extend beyond the conduct of judicial officers. A bribe has been defined as "something given for the purpose of improperly influencing official action, and either giving or accepting a bribe constitutes bribery." [31]

There is an obvious correlation between the common law offenses of bribery and extortion. Nevertheless, in addition to the fact that both a bribe-giver and a bribe-taker are guilty of bribery whereas the victim of extortion is innocent, another distinction between the offenses is apparent. The later development of the crime of extortion, including blackmail, occurred "in order to plug a loophole in the robbery law by covering sundry threats which will not do for robbery. . . . [B]oth crimes equally require that the defendant's threats induce the victim to give up his property, something which he would not otherwise have done." [32] Thus, although both bribery and extortion originated as offenses related to performance of public office, bribery is a victimless crime whereas extortion developed along the lines of robbery.

At their tangent, the offenses of bribery and extortion may both arise out of the same nucleus of operative facts. A public official who corruptly accepts an unauthorized fee for the performance of his official duty may be guilty of both bribery and extortion. At the opposite extreme, however, the offenses bear little resemblance.

Accordingly, congressional references to New York's law of extortion in a statute which did not proscribe bribery but was passed "to set up severe penalties for racketeering by violence, extortion, or coercion," creating a twenty year penalty, necessitate a Hobbs Act interpretation which includes the element of fear, threat or duress. A public official charged with extortion under the Hobbs Act should be able to argue that although he did in fact receive something of value, it was given at the initiative of the donor, and not as a result of force, fear or duress emanating from the defendant. Thus, in an indictment for extortion, it is logically and jurisprudentially sound to permit a defense of bribery. To hold otherwise is to blur completely the distinction between the two crimes. Our *Kenny* rule has precisely that effect.

The government supports this result for an obvious and self-serving reason. To obtain a conviction under the Hobbs Act, with its possible twenty year sentence, the government must prove "robbery or extortion," 18 U.S.C. § 1951(a); bribery is not illegal under the Hobbs Act. To establish a federal case of bribery implicating a state official, the government must resort to the

---

**28.** 160 F.2d at 756.

**29.** Ruff, *supra* note 24, at 1182.

**30.** *See, e. g., Bianchi v. United States*, 219 F.2d 182, 193 (8th Cir.), *cert. denied*, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955).

**31.** Perkins, *supra* note 26, at 468–69. *Accord* Wharton, *supra*, note 26, at 771–73.

**32.** LaFave & Scott, *supra* note 26, at 707.

Travel Act, 18 U.S.C. § 1952 (1970),[33] which prohibits both bribery and extortion. But the Hobbs Act jurisdictional base is much broader than that of the Travel Act. An essential element of any Travel Act offense is the requirement of travel in interstate commerce, or the use of interstate commerce facilities. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), noted that Congress did not intend overly broad application of the Travel Act which "would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies."

Prior to ascending the District Court bench in New Jersey, Judge Herbert J. Stern was the government prosecutor in *Kenny*. In urging an expansive meaning of extortion in the prosecution of public officials under the Hobbs Act, he wrote:

Under the Travel Act, the courts have required deliberate, knowing interstate travel or the similar use of interstate facilities to achieve the illegal act. However, under the Hobbs Act it has been held that if, in fact, the "extortion" affected interstate commerce, there is a violation of the Act notwithstanding the absence of an intent to have this effect, or even the absence of any anticipation that such an effect might result. . .

Thus, in situations where interstate travel or use of interstate facilities cannot be proven, or where the knowing use of them by the public official cannot be demonstrated, the federal government will often have to prosecute local political corruption under the Hobbs Act *or not at all.*[34]

But the fact that a government prosecutor who wants "to prosecute local political corruption" finds it easier to establish federal jurisdiction under the Hobbs Act than under the Travel Act cannot possibly form a reasoned basis for obliterating the distinction between the separate crimes of extortion and bribery or for affirming the Hobbs Act convictions of local public officials who were not permitted the defense that they were bribed. Our tolerance of this prosecutorial legerdemain is an indulgence in jurisprudential anarchy at the expense of basic tenets of criminal law—the presumption of innocence, the government's burden in all prosecutions, and the basic maxim *nullum crimen, nulla poena.* One charged with extortion, carrying a twenty year Hobbs Act penalty, should have the option of defending on the basis that he is guilty only of bribery under the Travel Act, carrying a five year penalty. This is an option, in my view, explicitly granted by the Congress. It is an option, unfortunately, which is substantially foreclosed by our decision in *Kenny.*[35]

---

**33.** (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or

controlled substances (as defined in section 102(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

**34.** Stern, *supra* note 25, at 9-11 (footnotes omitted, emphasis added).

**35.** Although my analysis does not follow completely that of Judge Luongo in *United States v. Kubacki*, 237 F.Supp. 638 (E.D.Pa.1965), I am persuaded that he properly perceived that a public official charged with extortion under the Hobbs Act should be able to defend on the basis that he was guilty of bribery only.

## VI.

The grave danger of our *Kenny* rule is its potential of embracing myriad situations which threaten fundamental federal-state relations and of creating very real tensions in the traditional operations of political party fund raising. The case at bar is illustrative of one set of circumstances. *United States v. Trotta*, 525 F.2d 1096 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), illustrates another facet of the problem. There, a municipal commissioner of public works was charged with demanding that a firm of consulting engineers contribute to the local Republican Committee. The district judge dismissed the indictment because it did not charge that there had been any adverse action, any threat of action, or, indeed, any relationship between the demand for contributions and any contract awarded by the defendant. The Second Circuit reversed, relying on another of *Kenny's* progeny, *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), stating, "So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951." *Trotta, supra*, 525 F.2d at 1100. The decision utilizes this far-reaching language:

> [I]t does not matter whether Trotta "induces payments to perform his duties or not to perform his duties." Nor does it matter that payments may have been induced simply by assertion of power or pressure stemming from Trotta's position as a public official. *United States v. Price*, 507 F.2d 1349 (4 Cir. 1974). To repeat, it is the use of the power of the public office itself to procure the payments of money not owed to the public official or his office that constitutes the offense. This was adequately alleged; and we, therefore, hold that the indictment is sufficient on its face.

525 F.2d at 1100–01. Professor Ruff's observations on this holding are significant:

> [I]f a public official who asks for a political contribution from one who does,

or may do, business with the government can be prosecuted on proof of those facts alone, then the Hobbs Act has become an extraordinary mechanism for controlling political activity on the state and local levels. . . . If the *Trotta* opinion means that a local government official commits extortion by soliciting a contribution from an organization that has or might have contracts with his agency, and is thereby liable to be imprisoned for twenty years, one may well ask whether a governor who attends a fundraising dinner and solicits contributions from the businessmen present has committed a felony.[36]

Applying his analogy to the case at bar, an intriguing question comes to mind. The prosecutor in this case was United States Attorney Richard Thornburgh who is now Governor of Pennsylvania. Can it be said that Governor Thornburgh, a man of the highest moral principles, would be guilty of a Hobbs Act violation if he now were to appear at a fundraising dinner and solicit contributions for his political party from Pennsylvania businessmen? I think not. But the Second Circuit believes that *Kenny* would allow it because such an act would have been done under color of office and there is no requirement of duress. I am quick to add that this is a hypothetical case and is not set forth here as an example of the facts at bar. But it is exactly the type of "Hobbs Act run rampant" that should immediately be checked by in banc reconsideration of this court's *Kenny* rule.

Accordingly, I dissent, and would order a new trial for all appellants.

---

**36.** Ruff, *supra* note 24, at 1196.